**770**

### In re LOVE–SEEMANN PROPERTIES, Debtor.

**Bankruptcy No. 84–00196.**

United States Bankruptcy Court, D. Hawaii.

May 6, 1985.

James Wagner, Honolulu, Hawaii, for debtor.

Glen Miyajima, Honolulu, Hawaii, for creditor, Honolulu Ltd.

Louise K.Y. Ing, Honolulu, Hawaii, for creditor, Federal Deposit Ins. Co.

Gordon Nelson, Honolulu, Hawaii, for Creditor, First Interstate Bank.

## ORDER DENYING CONFIRMATION OF PLAN

JON J. CHINEN, Bankruptcy Judge.

The proposal of Love-Seemann Properties, ("Debtor") for an Order to Confirm the Plan of Reorganization and the Motion for Appointment of Trustee filed by Honolulu Limited, a creditor, came on for hearing before the undersigned Judge on December 21, 1984 and February 11, 1985. At the hearing, Debtor was represented by James A. Wagner, Esq., Honolulu Limited by Glen M. Miyajima, Esq., the Federal Deposit Insurance Corporation ("FDIC") by Louise Y. Ing, Esq. and First Interstate Bank of Hawaii ("First Interstate") by Gordon Nelson, Esq. The Court, having considered the evidence, the memoranda filed by the parties and the arguments of counsel and being fully advised in the premises, hereby renders the following Findings of Fact, Conclusions of Law, and Order.

### FINDINGS OF FACT

This Court has jurisdiction of this contested matter pursuant to 28 U.S.C. § 1471 and 11 U.S.C. §§ 362, 363 and 552(b) and also under 11 U.S.C. § 1104, *et seq.*

Debtor filed its petition under Chapter 11 of the Bankruptcy Code on April 18, 1984, and is in possession of its property. Honolulu Limited is a corporation duly organized under the laws of the State of Hawaii.

The Debtor claims an interest in certain residential real property located in Hanalei, Island and County of Kauai, State of Hawaii, more particularly described as Tax Map Key Nos. 5-5-002-005 and 5-5-002-105 ("subject property"). Honolulu Limited is the fee owner of the subject property.

On or about May 5, 1978, Honolulu Limited entered into a certain Agreement of Sale whereby it agreed to sell and James C. Blackwell, Jr., and Virginia R. Blackwell ("Blackwells") agreed to purchase the subject property. Shortly thereafter on or about May 12, 1978, the Blackwells entered into two Sub-Agreements of Sale whereby the Blackwells agreed to sell and Michael

S. Seemann agreed to purchase the subject property.

Subsequently, on or about May 15, 1978, Michael S. Seemann assigned both of the aforementioned Sub-Agreements of Sale to Debtor. Payments in full of the total purchase price under the Agreement of Sale and under both Sub-Agreements of Sale were due on May 22, 1983.

The Debtor has failed to pay the balance of the purchase price due to the Blackwells under both Sub-Agreements of Sale in the principal amount of $560,000.00. Upon the Debtor's default on May 22, 1983, interest has accrued and continues to accrue on the indebtedness at the rate of 12% per annum or $67,200.00 per year.

The Debtor has failed to pay real property taxes on the premises since 1980. As of March 9, 1984, the delinquent amount of such taxes, interest and penalties totalled $18,882.43 and the Debtor has not paid any real property taxes from March, 1984 to the date of the hearing. The Debtor has disclosed that the real property tax delinquencies exceed $20,000.00. The Debtor's indebtedness to the Blackwells has remained in default since May 22, 1983 and as a result Honolulu Limited has received no payments since May 22, 1983.

On or about June 20, 1983, Honolulu Limited filed suit against, inter alia, the Debtor, seeking cancellation of the May 5, 1978 Agreement of Sale and/or foreclosure, in Civil No. 3046, in the Circuit Court of the Fifth Circuit, State of Hawaii. On or about February 22, 1984, the Circuit Judge granted Honolulu Limited's Motion for Summary Judgment and For Appointment of Commissioner For Sale of Real Property. The auction in foreclosure was scheduled to be held on April 19, 1984. The Debtor filed its petition in bankruptcy on April 18, 1984.

The Debtor has had the benefit of an over 20 months delay from the state court action since the filing of its petition in bankruptcy. Notwithstanding this delay, the Debtor has been unable to sell the subject property or to obtain financing to satisfy the Sub-Agreements of Sale which would thereby satisfy Honolulu Limited's Agreement of Sale.

The amount of Honolulu Limited's claim is increasing at the rate of nearly $5,000.00 per month, and the Debtor's debt to the Blackwells is increasing at the rate of $5,600.00 per month, all at the expense of the unsecured creditors of the Debtor.

The Debtor admits that it has listed the subject property for sale at $2.9 million and at $2.6 million, both figures being substantially higher than Debtor's own "appraisal".

Debtor is not operating any business on the subject property which is being used primarily as a vacation residence for the two partners. The property itself does not produce any income. The Debtor itself has no source of income and relies, if anything, upon monies to be furnished by one of the partners, namely by Stephen Love, who has admitted that he has no source of income and in fact has extensive liabilities and debts which are already in default and are subject to foreclosure proceedings in other courts.

Since the purchase of the property, the Debtor has had approximately 6 ½ years in which to attempt to sell the property and has been unsuccessful. The Debtor's proposed plan of reorganization provides that the Debtor shall have two more years after confirmation of the plan within which to sell the property. Since the subject property is not business property and is used as a vacation home by the two partners, there are no employees other than a caretaker.

Dennis Nakahara, a real estate appraiser, testified that the subject property has a cash sale value, as of December 19, 1984, of not less than $1,750,000.00. Terry Hand, the real estate broker who presently holds a listing of the property, testified that the value of the property is between $1,750,000.00 and $2,300,000.00, depending on the terms of the sale.

Since the filing of the petition on April 18, 1984, the Debtor has been actively marketing the subject property and has received three successive offers of $1,000,-

000.00, $1,200,000.00 and $1,350,000.00 respectively.

The Debtor's liabilities, based upon its own Ex Parte Application to Approve Listing Agreement filed on November 23, 1984, are approximately as follows:

1. Secured claims, including the claim of First Interstate Bank.   595,000.00
2. Priority claims (Wages & Taxes)   24,000.00
3. Unsecured claims   180,000.00
  $799,000.00

Instead of immediately selling the subject property, the Debtor proposes to take two years to market the property at $2.6 to 2.9 million, which would enable the Debtor to pay the creditors 100 percent of their claims. The Debtor contends that, if the subject property is sold at foreclosure at this time, all of the creditors may not receive a return of 100 percent.

## CONCLUSIONS OF LAW

The purpose of the Bankruptcy Code is to afford a means to a hard-pressed Debtor to avoid a forfeiture of his investment and to afford him an opportunity for a "fresh-start". Fresh-start means an ability to clear his liabilities without incurring any forfeiture. Any abuse of the spirit of the Code will not be condoned by the Court.

In the instant case, an Agreement of Sale and two Sub-Agreements of Sale are executory contracts and, as such, when assumed by the Debtor all defaults must be forthwith cured or assurances must be given to cure such default.

Both the Agreement of Sale and the Sub-Agreements of Sale were fully due on May 22, 1983, almost two years ago. However, no payment has been made since May 22, 1983 by the Debtor on its Sub-Agreements of Sale which, in turn, means that the Blackwells have not paid their obligation to Honolulu Limited on their Agreement of Sale.

The Debtor's total liabilities amount to approximately $800,000.00. Since filing its Petition for Relief, the Debtor has received offers to purchase the subject property at $1 million, $1.2 million and $1.35 million. If the Debtor accepts the $1,350,000.00 offer, even if the closing costs, including real estate broker's commission, should total 10% or $135,000.00, the Debtor will receive $1,215,000.00. After deducting the Debtor's existing liabilities of $800,000.00, there will be a net of $415,000.00 for the Debtor, which is more than adequate for a fresh-start.

Instead of seeking merely a fresh-start, the Debtor's plan of reorganization seeks to market the subject property at $2.6 to $2.9 million, at a price which is higher than its own witnesses' opinion of the market value of the property. The Debtor is seeking to become a millionaire through the Bankruptcy Court.

If the subject-property is not sold at the end of two years, the Debtor proposes to have it sold at auction. Yet, the Debtor claims in its Disclosure Statement that, if the subject property is presently sold at liquidation, the proceeds may not be sufficient to pay all the creditors 100% of their claims. If there is such a risk presently, to wait two years means that there will a greater risk that all the creditors may not be paid 100% of their claims, especially in light of the fact that the interest and other costs are increasing daily.

The subject property is not producing any income. The Debtor does not propose to pay Honolulu Limited anything until the subject property is sold. The Debtor proposes to pay the monthly maintenance costs, such as utilities and caretaker's salary, through contributions by one of the general partners. Yet, Debtor does not reveal the partner's source of income.

In *Matter of Madison Hotel Associates*, 749 F.2d 410 (7th Cir.1984), the Circuit Court stated as follows:

> Thus, for purposes of determining good faith under section 1129(a)(3), as well as section 1325(a)(3), the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

. . . .

According to the good faith requirement of section 1129(a)(3), the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code. The plan 'must be 'viewed in light of the totality of the circumstances surrounding confection' of the plan [and] ... [t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals.' *In re Jasik,* 727 F.2d 1379, 1383 (5th Cir.1984) (quoting *Public Finance Corp. v. Freeman,* 712 F.2d 219, 221 (5th Cir.1983).

In *Matter of Jesus Loves You, Inc.,* 46 B.R. 37 (Bkrptcy.M.D.Fla.1984), even though a plan called for 100% payment to all the creditors, the Bankruptcy Court held that, where the Petition was filed in bad faith, the plan will not be confirmed and the petition will be dismissed.

In the instant case, upon viewing the plan "in light of the totality of the circumstances surrounding confection of the plan", the Court finds that the Debtor's plan will not achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

Instead of trying to avoid forfeiture and to obtain a fresh-start, the Debtor is trying to achieve the status of a millionaire under the umbrella of the Bankruptcy Court. This is an abuse of the Bankruptcy Code and such conduct cannot be and will not be condoned.

### ORDER

IT IS HEREBY ORDERED that confirmation of the plan is denied.