**In re Cosmo D. WALKER and Cynthia J. Walker.**

**CRESTAR BANK, Plaintiff/Appellant,**

v.

**Cosmo D. WALKER and Cynthia J. Walker, Defendants/Appellees.**

Civ. A. No. 2:93cv343.
Bankruptcy No. 92–23138–B.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 5, 1994.

---

Ellen Charlotte Carlson, Paul Kevin Campsen, Kaufman & Canoles, Norfolk, VA, for plaintiff/appellant.

Robert Clinton Stackhouse, Jr., Stackhouse, Rowe & Smith, Norfolk, VA, for defendants/appellees.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

Cosmo D. Walker and Cynthia J. Walker (the "Walkers") are debtors in a Chapter 11 proceeding (the "Case"). Crestar Bank ("Crestar"), a Virginia Banking Association and one of ten unsecured creditors in the Case, appeals from a final order of the Bankruptcy Court confirming the Amended Plan of Reorganization (the "Amended Plan"). For the reasons set forth below, the decision of the Bankruptcy Court is reversed and remanded.

## STATEMENT OF FACTS

The Walkers are joint venturers in a land development project, Riverbend Associates, the assets of which are lots and undeveloped land. They derive additional income from other real estate investments. The Walkers are not otherwise employed. The petitions and schedules disclose that, when the Case was filed, the Walkers' assets totalled $4.2 million, while their liabilities were approximately $2.3 million.

The Walkers' financial distress arose out of a failed real estate transaction involving the sale of Midlothian Farm and the purchase of Five Gables Farm ("Five Gables"). When the Walkers obtained a contract for the sale of Midlothian Farm for $1.3 million, they entered a contract to purchase Five Gables for $1.15 million. The closing on Five Gables occurred before the sale of Midlothian Farm, and on June 14, 1988 Crestar made a bridge loan to the Walkers so that they could make the purchase. Thereafter, the contract to sell Midlothian Farm fell through and the Walkers were unable to find another buyer. From then until the summer of 1991, the Walkers attempted to secure a buyer for Midlothian Farm and they paid interest of approximately $10,000 per month on the Crestar loan by depleting the assets of a trust which the Walkers also used to fund their living expenses. On July 31, 1991, Crestar demanded payment in full on its loan and applied the remaining trust balance, slightly more than $83,000, to reduction of the remaining balance on the loan. Thereafter, the Walkers continued to market Midlothian Farm and they and Crestar explored options for payment of the balance of the loan.

Those efforts were unsuccessful and, on May 26, 1992, the Walkers filed this Case under Chapter 11, seeking financial reorganization. They listed ten unsecured creditors, of which Crestar was the largest, and three secured creditors.

On October 1, 1992, the Walkers filed a Plan of Reorganization (the "Plan") and a Disclosure Statement. The linchpin of the Plan was a generally articulated proposal to sell the Walkers' "valuable real estate." (Plan, p. 2). Although the Introduction to the Plan recites that it "provides for the liquidation of the three or four most saleable properties owned by the Walkers" (Plan, p. 4), its text reveals that all unsecured claims were to be "paid from the net proceeds of the sale of Midlothian [Farm] and the Portsmouth Blvd./Gum Road property" with any

deficiency to be made up from the Walkers' income from Riverbend Associates which also was contingent upon the sale of real estate owned by that partnership. (Plan, p. 9).

To achieve this objective, the Walkers proposed: (1) to reduce from $1.2 million to $950,000 the asking price on Midlothian Farm and to list it with a Gloucester realtor; and (2) to reduce from $895,000 to $850,000 the asking price on the Portsmouth Blvd./Gum Road property and to list it with a Portsmouth realtor. (Plan, pp. 10–11). The Midlothian Farm and Portsmouth Blvd./Gum Road properties were "... featured in this plan because, the Walkers believe that these properties are their most marketable, for the highest prices." (Plan, p. 10). The Walkers, however, "reserve[d] the right to fund the plan payments with the sales of their other properties if their other properties sell first." (Plan, pp. 10–11).

Although the Plan required the Walkers to use their "best efforts" to liquidate "as quickly as possible" the real estate to be sold to fund the payments to be made under it, the Plan also made clear that the Walkers "cannot warrant that the sales necessary to fund the plan will take place at or before a particular time" and apparently for that reason the Plan set no date for completion or for making payments to Crestar. Nor did the Plan establish any interim provisions for deciding whether to reduce the asking price of the properties, for changing real estate agents, or for deciding whether and when other or additional assets, real or personal, ought to be liquidated to enable the Walkers to make the payments contemplated by the Plan.

Notwithstanding that it left open-ended the timing for achieving payment of the creditors and that it vested unfettered discretion in the Walkers as to the details of implementation, the Plan provided that the Walkers could ask the Bankruptcy Court to close the Case upon "substantial compliance with the terms and requirements of the plan." (Plan, p. 12). Meanwhile, the Plan permitted the Walkers to continue to live in, and to make payments on, their home out of income from Riverbend Associates which also was specified as the source (i) of the Walkers' living expenses and (ii) of the back-up payments for

funding the Plan if the proceeds of the sale of the Portsmouth Blvd./Gum Road property were inadequate to the task. (Plan, pp. 10–11). Nor did the Plan contemplate liquidation of the Walkers' extensive personalty and consequently those assets would remain available for their use and enjoyment. Finally, the Plan made no provision for limiting the rights of the Walkers to alienate, dispose of or encumber either their real or personal assets.

On December 31, 1992, the Walkers filed the Amended Plan which differed from the Plan only in creating separate classes for the claims of the Internal Revenue Service and certain real estate taxes. On January 4, 1993, Crestar submitted a ballot, voting to reject the Amended Plan. All other unsecured creditors and the secured creditors accepted the Amended Plan. On January 25, 1993, Crestar filed objections to confirmation of the Amended Plan enumerating five grounds on which it elaborated at the confirmation hearing. Crestar argued that:

**1.** The Amended Plan lacked specificity respecting how and when payments would be made to creditors, thereby violating the "good faith" requirement of 11 U.S.C. § 1129(a)(3). In a related argument, Crestar asserted that the Amended Plan also lacked enforcement mechanisms to ensure that the Walkers would aggressively sell their assets, thereby failing to satisfy the "adequate means of implementation" requirement of 11 U.S.C. §§ 1129(a)(1), 1123(a)(5).

Crestar expanded its good faith objection at the confirmation hearing to include the argument that the Amended Plan constituted an impermissible injunction operating only against Crestar because all other creditors were to be paid in full long before Crestar's debt would be fully satisfied while Crestar was precluded from exercising its rights to reduce its debt to judgment or from transfer satisfying it.

**2.** The Amended Plan did not limit the ability of the Walkers to further encumber their assets or to incur additional debt, and in this way also failed to satisfy the good faith and adequate means of implementation provisions of Title 11.

**3.** The unreliable projections of the anticipated proceeds from the saleable property did not sufficiently indicate that creditors would be paid in full, and the provision in the Amended Plan that required only "substantial compliance" for completion failed to satisfy the "best interest of creditors" test set by 11 U.S.C. § 1129(a)(7)(A)(ii).

**4.** The Amended Plan failed to identify a consistent source of income for funding its provisions, thereby rendering the Amended Plan "not feasible" under 11 U.S.C. § 1129(a)(11). Crestar expanded on this objection during the hearing by arguing that the Amended Plan was visionary and promised creditors more than they actually could receive after confirmation because the only two assets which the Walkers were marketing actively could not generate sufficient proceeds to satisfy the unsecured debt in full. In a related argument, Crestar asserted the Amended Plan was not workable because it posed the likely need for future liquidation and further reorganization.

**5.** The Amended Plan failed to comply with the cramdown provision in 11 U.S.C. § 1129(b) under which the Walkers were required to show that the Amended Plan did not unfairly discriminate against, and was fair and equitable to, the objecting creditor. According to the arguments made by Crestar at the confirmation hearing, the Amended Plan failed to satisfy this provision because it provided for prompt payment of the secured creditors and all unsecured creditors other than Crestar and allowed the Walkers to continue an excessive lifestyle and to retain their assets while Crestar was compelled to wait for repayment at an indeterminate time in the future. Crestar also argued that, because the Amended Plan allowed the Walkers to receive a discharge for "substantial compliance" with its terms while retaining most of their assets, the Amended Plan unfairly discriminated against it and was neither fair nor equitable.

Crestar also objected to confirmation for the reason that the Amended Plan failed the best interests of creditors test set out in 11 U.S.C. § 1129(a)(7). In that regard Crestar asserted that, because the Walkers' assets were greater than their total debt, all creditors would fare better under immediate Chapter 7 liquidation than under the Amended Plan which did not guarantee full repayment. Crestar also argued that, because it provided that the Walkers would receive a discharge upon "substantial compliance", the Amended Plan could not be in the best interest of the creditors.

In an apparent attempt to meet some of Crestar's objections, the Walkers adjusted their positions during the confirmation hearing. First, they agreed that a failure to pay the unsecured creditors in full with 7% interest would constitute an act of default. Second, the Walkers represented that all of their assets would be liquidated "if necessary." Finally, the Walkers urged that Crestar's objections could be addressed "by very clear and firm language in the confirmation order" and asked that the Amended Plan be confirmed.

After this presentation, the Bankruptcy Court overruled Crestar's objections and decided to confirm the Amended Plan. However, in response to Crestar's "concerns" and its own, the Bankruptcy Court imposed the following conditions on confirmation:

Based upon the statements, representations and evidence presented at the Hearing on Confirmation, concerns of Crestar Bank brought to the Court's attention and concerns of the Court the Court has decided to confirm the Plan based on the following conditions:

A. The Unsecured Creditors Class VI, will receive 100% of their allowed unsecured claims plus interest at the rate of 7% per annum from the date this order is entered.

B. All assets owned by the Debtors are subject to liquidation and this Court's jurisdiction, however, the Debtors will control the method of liquidation subject to the terms of this Order.

C. The payments to unsecured claimants will be completed on or before August 1, 1996. Upon a default under this paragraph, the Court will then decide whether seizure of any remaining assets is appropriate, and the Court will retain jurisdiction over those assets during per-

formance of the Plan, so that it may order seizure of said assets for cause if such cause develops.

D. There will be no alienation of the property without proper order of this Court. Alienation will include, without limitation, placing additional liens or encumbrances of any kind on estate property.

E. An inventory, to be prepared by Carl Hales, Bankruptcy Court Evaluator, will be conducted and the results will be filed with this Court within ten days.

F. The Debtors will not increase their present average monthly living expenses to an unreasonable degree, and the Debtors will continue to file monthly reports with the Court which must be kept up-to-date and current.

(Order of Confirmation, February 25, 1992). This appeal followed.

## DISCUSSION

On appeal, the Bankruptcy Court's findings of fact are reviewed under the clearly erroneous standard and its legal conclusions are subject to *de novo* review. *In re Johnson,* 960 F.2d 396 (4th Cir.1992); *In re McCauley,* 105 B.R. 315 (E.D.Va.1989). The appeal presents two issues: (1) whether the *sua sponte* imposition of conditions to the Amended Plan by the Bankruptcy Court violated 11 U.S.C. § 1127 which allows "[t]he proponent of a plan to modify such plan at any time before confirmation...." and (2) whether the Bankruptcy Court erred in confirming the Amended Plan over Crestar's objections.

### I. Modification of the Amended Plan

Crestar contends that, by imposing the conditions on the Amended Plan, the Bankruptcy Court modified the Amended Plan, *sua sponte,* and thereby violated 11 U.S.C. § 1127(a) which, as Crestar sees it, permits only a proponent of a plan to modify it before confirmation. Crestar relies principally on *Goodman v. Phillip R. Curtis Enterprises, Inc.,* 809 F.2d 228 (4th Cir.1987) to support this interpretation of the statute. In *Goodman,* the Bankruptcy Court on its own motion modified a previously confirmed plan by requiring the Chapter 11 debtor to settle a personal injury action and to use the settlement proceeds to fund the plan. Although the personal injury action had been initiated before confirmation, the plan made no provision for use of the settlement proceeds to be derived from any future settlement. *Id.* at 232. The Court of Appeals vacated the orders of the Bankruptcy Court modifying the plan because they were entered without "the notice, hearing, and formal confirmation required." *Id.*

Crestar argues that *Goodman* stands for the proposition that "modifications to a plan may not be made by the Bankruptcy Court, *sua sponte.*" (Brief of Appellant, at 9.) That argument does not square with the holding in *Goodman* which turned on whether the modifications were made in compliance with the procedural requirements for modifications in 11 U.S.C. § 1127(b), not on whether the Bankruptcy Court had jurisdiction to modify a plan. *Id.* at 233.[1] For that reason, the Court of Appeals concluded that, based on the facts before it, "the orders must be held at least voidable for procedural irregularity on this direct attack." *Id.* at 233. Finding that the *sua sponte* actions of the Bankruptcy Court were "the first step toward irregularity" in the case, the Court of Appeals remanded for compliance with the applicable procedural requirements. In so doing, the Court of Appeals acknowledged that the Bankruptcy Court was empowered to modify a confirmed plan under the appropriate circumstances provided that the applicable procedural requirements had been satisfied. *See id.* at 234.[2] Hence, *Goodman*

---

1. The Court of Appeals held:

 In effect, the bankruptcy and district court's various post-confirmation orders respecting Goodman's personal injury claim involved attempted modifications of the confirmed plan to draw in that item of estate property. We therefore believe that the proper way to analyze the authority of the courts to enter those orders is to consider their procedural regularity as orders effecting a § 1127 modification, rather than as possible excesses of any retained post-confirmation jurisdiction.

 *Goodman,* 809 F.2d at 233.

2. The fallacy of Crestar's position is further illustrated by the reference to *Goodman* in *In re FCX, Inc.,* 853 F.2d 1149, 1158 n. 13 (4th Cir.1988).

does not support the argument that the Bankruptcy Court in this case violated 11 U.S.C. § 1127(b) by confirming the Amended Plan subject to conditions.

Moreover, *Goodman* is distinguishable on its facts for two reasons. First, in *Goodman* the Bankruptcy Court, relying on facts not before it at the confirmation hearing, made post-confirmation modifications to the plan. Here, the conditions were imposed before the Bankruptcy Court confirmed the Amended Plan and those conditions were responsive to facts and circumstances addressed at the hearing and merely served to refine aspects of the Amended Plan to which Crestar had objected. Hence, it is doubtful that these conditions are modifications as that term is used in the statute. Second, even if the conditions imposed here by the Bankruptcy Court can be characterized as modifications within the meaning of 11 U.S.C. § 1127, the procedural irregularities which prompted reversal in *Goodman* are not present in this case. To the contrary, all the conditions listed in paragraph 15 of the Order of Confirmation were addressed to issues that were litigated at the confirmation hearing or were the logical outgrowth of those issues necessitated by positions taken, or evidence introduced at, the hearing.

■ The Bankruptcy Court's authority to impose conditions on the confirmation of a plan is grounded in 11 U.S.C. § 105 which provides that:

> The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte,* taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

Where, as here, the Amended Plan was timely distributed for review and objections were made to it, § 105 permits the Bankruptcy Court to address those objections at the confirmation hearing by conditioning confirma-

tion upon the satisfaction of terms narrowly tailored to be responsive to the objections as they are developed in the prehearing pleadings and addressed at the hearing. Nothing in this interpretation of § 105 offends the provision in 11 U.S.C. § 1127 which permits the proponent of a plan to modify it before confirmation.

■ There are no doubt conditions which, by their nature or because of the circumstances arising at the hearing, so fundamentally alter a plan that their imposition would require the plan to be formally revised and redistributed for comment and hearing. However, the Bankruptcy Court must be free to respond at the conclusion of a confirmation hearing to objections filed and properly served before the confirmation hearing without first submitting its responses to notice and comment. Otherwise, the confirmation procedure would be burdened by a superfluous procedural ritual which is neither required by 11 U.S.C. § 1127 nor made necessary if 11 U.S.C. § 105 is interpreted to permit the kind of action taken here by the Bankruptcy Court. The imposition of conditions, such as those here at issue, on the proponents of a plan is among the powers available to the Bankruptcy Court so long as those conditions are responsive to and a logical outgrowth of issues raised by the creditors and as to which notice and opportunity for hearing have been given.

## II. Crestar's Substantive Objections

Crestar also appeals the substantive decision of the Bankruptcy Court confirming the Amended Plan. Each of Crestar's challenges amount to an assertion that, even in perspective of the conditions it imposed, the Bankruptcy Court erred in failing to sustain Crestar's objections.

### 1. Lack of Good Faith and the Failure to Provide an Adequate Means of Implementation.

A plan of reorganization cannot be confirmed unless it satisfies 11 U.S.C. § 1129(a)(3) which requires that the plan

There the Court of Appeals noted that in *Goodman* "... we implied that some procedural irreg-

ularities might not be so egregious as to warrant setting aside a modification order." *Id.*

must be proposed in good faith and not by any means forbidden by law. The good faith provision of 11 U.S.C. § 1129(a)(3) is designed to "prevent abuse of the bankruptcy laws and protect jurisdictional integrity." *In re Bradley*, 60 B.R. 571, 573 (Bankr.E.D.Va. 1986) (quoting *In re Talledega Steaks, Inc.*, 50 B.R. 42, 43 (Bankr.N.D.Ala.1985)).

The overriding standard for good faith within the meaning of 11 U.S.C. § 1129(a)(3) is whether "there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1315 (8th Cir.1987) (quoting *In re Toy and Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y.1984)). However, whether a plan is filed in good faith is a matter to be assessed in view of the totality of the circumstances which necessitated the plan, in perspective of the purposes of the Bankruptcy Code. *See Matter of Jasik*, 727 F.2d 1379, 1383 (5th Cir.1984). Finally, it is necessary to keep in mind that reorganization under Chapter 11 was intended to afford the earnest debtor an opportunity to restructure its finances in such a fashion as to permit continued operation of business ventures so as to enable payment of creditors, rather than face immediate liquidation. Indeed, prompt payment of creditors is a primary objective of a Chapter 11 reorganization. *See In re Kemp*, 134 B.R. 413, 415 (Bankr.E.D.Cal.1991) (citing *In re Hoosier Hi–Reach, Inc.*, 64 B.R. 34, 38 (Bankr.S.D.Ind.1986)). Accordingly, the failure of a debtor to use the full reach of its disposable resources to repay creditors is evidence that a plan is not proposed in good faith because such conduct frustrates this objective. *See Kemp*, 134 B.R. at 415.[3]

It is against these principles that the Amended Plan and Crestar's objections under 11 U.S.C. § 1129(a)(3) must be measured. The Amended Plan proposed to pay the unsecured creditors in full with interest at the annual rate of 7%. This objective was to be accomplished by the sale of Midlothian Farm and the Portsmouth Blvd./Gum Road property. If the proceeds of those sales were insufficient to fully satisfy the claims of the unsecured creditors, funds to be derived from a sale of real estate owned by Riverbend Associates were to be used to complete the task. The Walkers' other assets were made subject to liquidation "if necessary," but there was no standard set for measuring when and how resort to those assets could be had.

The Amended Plan established no time for completion, defined no events of default and required no payments to unsecured creditors until the Midlothian Farm and the Portsmouth Blvd./Gum Road property were sold. Nonetheless, the Amended Plan provided that the Walkers could be discharged upon substantial compliance with its terms.

The Amended Plan imposed no limitations on the use by the Walkers of their substantial assets, including the investment income and the proceeds from the sale of the assets of Riverbend Associates which was the only specifically identified source of funding for the Amended Plan if Midlothian Farm and the Portsmouth Blvd./Gum Road property could not be sold at prices which would permit payment of the claims of the creditors in full. Remarkably, the Amended Plan imposed no restrictions on the Walkers' living expenses.

At the same time, the Amended Plan permitted the Walkers to retain access to, and

---

3. In *Kemp*, the debtor, who had an annual net income of $180,000, was subject to a $300,000 judgment in favor of his former wife. The Chapter 11 plan proposed to satisfy the wife's judgment at the rate of $4,000 per month paid over a ten year period. Considering the totality of the circumstances, and assessing the ability of the debtor to have made more substantial payments towards satisfaction of the judgment, the court found that the plan of reorganization was not proposed in good faith. *See Kemp*, 134 B.R. at 415.

Of course, the ability of the debtor to make higher payments, standing alone, does not preclude a finding of good faith. *See In re Porter*, 102 B.R. 773, 776 (9th Cir.BAP 1989). In *Porter* the Court of Appeals found that "the Debtors have dedicated all disposable income to the plan and do not enjoy an exorbitant standard of living," *id.* at 776, and that the debtor's plan was proposed in good faith because the "repayment program [was] ... related to the debtor's ability to make payments out of future income." *Id.* at 775 (citing *In re Slade*, 15 B.R. 910, 912 (9th Cir.BAP 1981)).

control of, their substantial assets which included: (1) a 3,500 square foot home which is located on twenty acres of waterfront property and which contains as appurtenances a four car garage and a twelve stall stable, the total value of which was estimated to be $2 million with an encumbrance of $470,000; (2) nine show horses valued at approximately $500,000; (3) an antique car collection valued at approximately $150,000; (4) notes receivable valued at approximately $1.2 million; (5) a partnership interest valued at approximately $729,000; and (6) the income from their investments. Finally, the Amended Plan contained no restrictions on the sale, transfer or encumbrance of the Walkers' largely unencumbered assets and the Walkers were permitted to incur post-confirmation secured obligations which, in the event of defaults and subsequent foreclosure, would remove those subsequently encumbered assets as sources of funding payments under the Amended Plan.

The Bankruptcy Court admittedly was concerned about these problems and sought to address them by imposing conditions to confirmation. The conditions imposed by the Bankruptcy Court required the Walkers to agree that all of their assets would be subject to liquidation in order to fund the Plan, but the conditions allowed the Walkers to retain exclusive control over the method and timing of liquidation subject only to a requirement that the unsecured creditors were to be paid not later than August 1, 1996.

The Bankruptcy Court also conditioned any further alienation of "the property," upon first securing an order from the Bankruptcy Court. It is unclear to what "property" the limitation on alienation actually applies. Finally, the Bankruptcy Court imposed the condition that the Walkers "not increase their present average monthly living expenses to an 'unreasonable degree'. . . .". There was no definition of what would be considered an "unreasonable degree."

Even with the conditions imposed by the Bankruptcy Court, it is virtually impossible to conclude that there exists "a reasonable likelihood that the [the Amended] Plan will achieve a result consistent with the standards prescribed under the Code." *Hanson,* 828

F.2d at 1315. Nor does it appear that the Amended Plan, even as conditioned, is consistent with the fundamental purpose of the good faith provision which is to prevent abuse of the bankruptcy laws. *In re Bradley,* 60 B.R. 571, 573 (Bankr.E.D.Va.1986).

■ When the controlling legal principles are applied to the record and the Amended Plan, as conditioned, it is necessary to determine whether the good faith requirement can be satisfied where the assets of the Chapter 11 debtors exceed their liabilities by approximately $2 million and the plan of reorganization: (1) does not obligate the debtors to make any payments to secured creditors for a period of four years; (2) does not provide a schedule for the liquidation of assets critical to the funding of the plan and consequently to its ability to achieve a result consistent with the requirements of the Bankruptcy Code; (3) allows the debtors virtually unfettered discretion in deciding when and how to market assets to be sold to provide funding for the plan and in determining the appropriate price to accept for the sale of those assets; and (4) permits the debtors to fund their house payment and living expenses in part from assets which may be necessary to fund the payments and, at the same time, imposes no definitive restrictions on the abundant, if not lavish, lifestyle of the debtors except to preclude them from expanding it to "an unreasonable degree."

Considering the foregoing and the complete record, the court cannot conclude that the good faith requirement of 11 U.S.C. § 1129(a)(3) has been satisfied. To the contrary, the Amended Plan, even in perspective of the conditions imposed by the Bankruptcy Court, presents a fundamental abuse of the provisions of Chapter 11 because: (i) it subjects Crestar to unacceptable risks; (ii) it does not adequately commit the full range of the debtors resources to repayment of Crestar's debt; (iii) it vests unaccepted, uncontrolled and unreviewable discretion in the debtor to determine how and when its assets will be liquidated; and (iv) it basically makes the relief available under Chapter 11 a vehicle for the continued pursuit of a very enjoyable lifestyle by the debtors at the expense of its largest unsecured creditor which is made

subject to a remarkable range of discretion vested in debtors who, except for a modest interest requirement, have no motivation to make the sales required to pay the creditor. Indeed, the Amended Plan simply requires Crestar to ride out the real estate market during the four years following confirmation on the hope that it will improve so that the Walkers will not be required to take a loss on the liquidation on any of their assets. The court does not consider that to satisfy the good faith requirements of 11 U.S.C. § 1129(a)(3) or to be a permissible use of Chapter 11. No authority cited by the Walkers suggests otherwise.

■ In a related argument, Crestar asserts that the absence of an adequate means to implement the plan as required by 11 U.S.C. § 1123(a)(5) also evidences a lack of good faith. Several courts have confronted this issue and have determined that the absence of an adequate means of implementation demonstrates a lack of good faith thereby precluding confirmation of the plan of reorganization.

For example, in *In re Sutton,* 78 B.R. 341 (Bankr.S.D.Fla.1987), the Amended Plan provided for the satisfaction of the claims of all creditors upon the sale of shares of stock in the debtor's business. The plan provided a minimum sales price to be realized within 120 days from the date of confirmation. The court declined to confirm the plan for the reason that it lacked adequate means of implementation as required by 11 U.S.C. § 1123(a)(5) and thereby failed to satisfy the good faith requirement of 11 U.S.C. § 1129(a)(3). The court held:

> [The] Debtor's chapter 11 plan ... boils down to nothing more than an announced hope that he will sell his stock by February 6, 1988 for enough to satisfy the debt.... He has produced no specific offer of purchase, no specific sale date, and no credible basis to value the stock. He asks this court to hold the corporate creditor at bay another five months from today to see if he can do what he hopes to do, but has failed to do for the past ten months.

*In re Sutton,* 78 B.R. at 342. Here too, there have been unsuccessful efforts over several years to sell the real estate by which the Amended Plan is to be funded. The Walkers, like the debtor in *Sutton,* are simply proposing more of the same.

The court in *In re Love–Seemann Properties,* 49 B.R. 770 (Bankr.D.Hawaii 1985) was confronted with a plan of reorganization which provided for the sale of the debtor's real estate as a means of implementing the plan. The debtor had received three offers after filing bankruptcy. However, the plan provided a two year period within which to achieve the sale based upon the debtors subjective belief that the delay would result in a substantially higher price than an early sale. The debtor argued that if the property was liquidated immediately the proceeds might be insufficient to pay the creditors 100% of their claims. *Id.* at 772. The Bankruptcy Court was unpersuaded by the debtor's argument and concluded that the present risk, that all the creditors may not receive 100% of their claims under immediate liquidation, stood only to increase over the two-year period. *See id.* at 772. The Bankruptcy Court denied confirmation of the plan holding that:

> The purpose of the Bankruptcy Code is to afford a means to a hard-pressed Debtor to avoid a forfeiture of his investment and to afford him an opportunity for a "fresh-start." Fresh-start means an ability to clear his liabilities without incurring any forfeiture. Any abuse of the spirit of the Code will not be condoned by the Court.

*Id.* The Bankruptcy Court concluded that, where the debtor was seeking to gain a financial windfall by delaying liquidation, the bankruptcy procedure had been abused, thereby precluding a finding of good faith.

■ Other courts have found that plans of reorganization which fail to provide specific details for the sale of real estate, (including the date by which the sale must occur) or to identify the potential purchaser and the expected price do not satisfy the adequate means of implementation requirement of the Code thereby precluding confirmation. These decisions spell out a principle which is of vital significance to the credibility of reorganization under Chapter 11: *"[T]he debtor must offer more than speculation about the source of funding for the plan."* In re Bris-

coe Enterprises, Ltd., 138 B.R. 795, 807 (N.D.Tex.1992) (citing In re Stuart Motel, Inc., 8 B.R. 48, 50 (Bankr.S.D.Fla.1980)) (emphasis added). The authorities teach that it is important for a plan of reorganization to make reasonably specific provisions for an adequate means of implementation because speculative, indefinite plans will necessitate objections by the creditors who have no reasonable means by which to assess whether a plan can achieve the results contemplated by the Code, and because the courts will have no objective criteria by which to make confirmation judgments. In fact, it is extremely difficult, if not impossible, for a court to determine the validity of any claimed default unless the plan articulates with reasonable specificity the means for implementation.

Moreover, a plan of reorganization which does not reasonably articulate an adequate means by which it is to be implemented simply requires the creditors and courts to rely upon the "honesty and good intentions" of the debtors. This is an insufficient basis to satisfy creditors, courts or the standards imposed by the Bankruptcy Code. See In re BBT, 11 B.R. 224, 235 (Bankr.D.Nev.1981). Taken as a whole, the Amended Plan, even considering the conditions imposed by the Bankruptcy Court, fails the adequate means of implementation requirement of 11 U.S.C. § 1123(a)(5).[4]

### 2. The Feasibility Requirement.

 In order to be confirmed, a plan of reorganization also must be feasible within the meaning of 11 U.S.C. § 1129(a)(11). This provision imposes a requirement that any plan must provide a realistic and workable framework for reorganization. The plan is considered feasible where it is not likely to be "followed by the liquidation, or the need for further financial reorganization, of the debtor...." 11 U.S.C. § 1129(a)(11). Of course, "[i]t is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success." In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1229-54 (15th ed. 1991)). Accordingly, it is the responsibility of the court to examine the plan carefully to determine whether it is workable and has a reasonable prospect of succeeding. In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir.1985); see United Properties, Inc. v. Emporium Department Stores, Inc., 379 F.2d 55, 64 (8th Cir.1967). "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." 5 COLLIER ON BANKRUPTCY, ¶ 1129.-02[11], at 1129-59 (15th ed. 1993); see Matter of Pizza of Hawaii, 761 F.2d 1374, 1382 (9th Cir.1985). The feasibility test was applied in In re Hoffman, 52 B.R. 212 (Bankr.D.N.D. 1985) wherein a debtor proposed to satisfy the claims of creditors from the sale of the debtor's real property within two years. The plan did not identify a potential purchaser and did not articulate the proposed terms of the sale. The Bankruptcy Court noted that

> [s]incerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.

Id. at 215 (quoting In re Bergman, 585 F.2d 1171 (2d Cir.1978)). Because there was no ability to measure whether the plan was susceptible of achievement after confirmation, the court determined that the plan was not feasible. Id.

---

4. The Walkers correctly argue that the Amended Plan contains some specificity. For example, they contend that the Midlothian Farm will be sold for $950,000 and the Portsmouth Boulevard/Gum Road property for $850,000. However, at the confirmation hearing, the Walkers presented a contract for the sale of Midlothian Farm in the amount of $650,000 of which only $480,-000 was to be distributed to unsecured creditors. Further the evidence at the confirmation hearing established that the Portsmouth Boulevard/Gum Road property had a value of $150,000. On this record it is not possible to conclude that there was in the Amended Plan sufficient specificity respecting this key component of the plan. Of course, the Walkers are not actively marketing any other of their assets and therefore their value cannot be considered as available to fund the plan and certainly do not satisfy the adequate means of implementation requirement.

The Amended Plan, even as conditioned, provides no basis upon which to conclude that it is feasible within the meaning of 11 U.S.C. § 1129(a)(11). Without knowing the terms of the proposed sales of Midlothian Farm and the Portsmouth Blvd./Gum Road property, and without knowing the specific timeframe for the proposed sale, and without articulation of a schedule and a plan for the liquidation of other properties in the event that the sale of the Midlothian Farm and the Portsmouth Blvd./Gum Road property fails to yield sufficient funding, it is impossible for a court to find that there will be no need for further financial reorganization or indeed liquidation of the Bankruptcy Estate. Thus, on the record before it, the Bankruptcy Court lacked a legally sufficient basis to conclude that the Amended Plan will satisfy the feasibility requirement and it erred in confirming the Amended Plan without requiring the Walkers to satisfy the feasibility requirement.

**3. The Best Interests of Creditors Test.**

Crestar claims that the Amended Plan fails to satisfy the best interest of the creditors test which requires that creditors receive as much pursuant to a Chapter 11 plan of reorganization as they would from a Chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A)(ii). The focus of the inquiry under this standard is the impact each option will have on the creditors. *See In re Superior Siding & Window, Inc.,* 14 F.3d 240, 243 (4th Cir.1994). The Walkers' assets were listed to be approximately $4.2 million and their liabilities were listed as approximately $2.3 million.

If the Walkers were forced into an immediate Chapter 7 liquidation, it appears that the sale of their assets might satisfy the claims of the unsecured and the secured creditors. The Amended Plan, as conditioned, projects that creditors will be paid 100% of their claims and will earn 7% interest until payment. However, as explained above, the Amended Plan is speculative at best and, on this record, it was not possible for the Bankruptcy Court to make a legally sufficient finding that the creditors will fare better under Chapter 11 than under an immediate Chapter 7 liquidation. In order for the Walkers to justify their eligibility for the protection afforded by Chapter 11, the record must establish that a Chapter 11 bankruptcy is in the best interest of all creditors. This requires that the Walkers demonstrate that the creditors would receive more under the Amended Plan, as conditioned, than they would if immediate liquidation were required under Chapter 7. The Walkers did not satisfy that responsibility.

### CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court confirming the plan is reversed and vacated. This matter is remanded to the Bankruptcy Court so that, within sixty (60) days of the date this order is entered, the Walkers can present a plan of reorganization which does not suffer from the defects discussed above. If the Walkers are unable to do that, the Bankruptcy Court shall take such action as is appropriate, including, without limitation, determining whether the Case should be converted so that liquidation may proceed under Chapter 7.

The issues were fully addressed by the briefs and the court finds that oral argument is not necessary to resolution of the issues presented by this appeal.

It is so ORDERED.