In re Bernard M. CARLTON and
Sylvia D. Carlton, Debtors.

Bankruptcy No. 93–10929–AT.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Dec. 2, 1994.

Stephen S. Mitchell, Alexandria, VA, for Warrenton Farm Credit.

Thomas P. Gorman, Alexandria, VA, for Perry Winston, Executor of the Estate of Robert D. Manning.

Robert G. Mayer, Mayer & Scanlan, P.C., Fairfax, VA, for debtors.

### MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

Hearing was held on September 7, 1994, on the confirmation of debtors' Revised Plan of Reorganization dated July 19, 1994. Creditor Warrenton Farm Credit, ACA, objected to confirmation on numerous grounds. The court took the matter under advisement. After hearing the respective arguments of counsel and after reviewing proposed findings of fact and conclusions of law submitted by both counsel, the court finds that the plan does not discriminate unfairly and is fair and equitable. Accordingly, the court will enter an order confirming the plan.

### Findings of Fact [1]

Bernard M. Carlton and Sylvia D. Carlton filed a joint voluntary petition as husband and wife under Chapter 11 on March 4, 1993.

Among debtors' assets are ten parcels of land in Loudoun County, Virginia, known as Eudora Farm, aggregating approximately 283 acres. One of these, Lot 1, includes an 8601 square foot manor house in which debtors live. The other lots (Lots 2 through 9 and 4A) are either unimproved or have structures of no significant value (such as old tenant houses).

Debtors purchased Eudora Farm in January 1986 from the Estate of Robert D. Manning for $1,050,000.00 with the plan of developing a "cluster" subdivision. As a result of changes in Loudoun County zoning policies, Mr. Carlton abandoned his original development plans and since June 1991 has attempted without success to sell the unimproved lots.

All the lots except for Lot 4A are encumbered by a first lien deed of trust securing

---

**1.** At the September 7, 1994, hearing the parties agreed that the prior testimony that had been received from the four appraisers and Bernard M. Carlton at the relief from stay and confirma- tion hearings on January 11, 1994, and May 5, 1994, would be treated as part of the record for the purpose of the hearing on confirmation.

several purchase money notes in favor of Perry Winston as Executor of the Estate of Robert D. Manning. The principal balance on the deed of trust is $825,000.00 with interest at 11% due from January 31, 1992. At the date of the confirmation hearing, the amount due including attorneys fees was $1,058,507.00.

All the lots are subject to a deed of trust (which is a second lien on Lots 1 through 9 and a first lien on Lot 4A) in favor of Warrenton Farm Credit which secures repayment of a loan made to debtors in 1988. The loan proceeds were used to renovate the manor house. The principal balance is $688,281.04 with an adjustable rate of interest.[2] The total amount due at the time of the hearing was $833,780.00.

Four appraisers, Wendell Kline, David LeRoy, Dennis Gorman, and Paula McDole[3] testified as to the values of the various lots as follows:

| Lot | Leroy | Kline | Gorman | McDole |
|-----|-------|-------|--------|--------|
| Lot 1 | $1,750,000 | $763,034 | $1,000,000 | $1,500,000 |
| Lot 2 | 314,663 | 157,325 | 240,000 | 275,000 |
| Lot 3 | 240,395 | 127,260 | 140,000 | 213,000 |
| Lot 4 | 239,970 | 139,920 | 154,000 | 200,000 |
| Lot 5 | 259,922 | 158,620 | 147,000 | 213,000 |
| Lot 6 | 260,677 | 129,520 | 140,000 | 250,000 |
| Lot 7 | 178,360 | 89,200 | 120,000 | 135,000 |
| Lot 8 | 187,738 | 93,850 | 120,000 | 135,000 |
| Lot 9 | 244,027 | 122,000 | 135,000 | 220,000 |
| Lot 4A | 120,000 | 75,900 | 75,000 | 115,000 |

Each of the appraisers appeared to adopt those assumptions most favorable to the party calling the witness. At the first confirmation hearing, this court found that Lots 2 through 9 had an aggregate value of $1,500,000.00 and that all the lots together had a value of at least $2,500,000.00.

Payments on the Manning Estate notes are delinquent since March 1992. No payments were made postpetition until this court ordered the debtors to begin making $3,000.00 per month adequate protection payments to the Manning Estate.

No payments, prepetition or postpetition, have been made on the Warrenton Farm Credit note since August 1992. The note matured on December 21, 1992.

On July 2, 1993, debtors filed a plan of reorganization, and submitted an amended plan on January 5, 1994. Confirmation was ultimately denied on May 5, 1994.

On July 19, 1994, debtors filed a revised plan.

No party objected to the disclosure statement except for the Manning Estate, which conditionally withdrew its objection at the confirmation hearing subject to the debtors' agreement to amend the plan in several particulars and successful confirmation of the plan as so amended.

Pursuant to 11 U.S.C. § 1111(b), Warrenton Farm Credit timely elected to have its claim treated as fully secured.

The revised plan was accepted by more than one-half in number and two-thirds in dollar amount of all impaired classes except for the Manning Estate, Warrenton Farm Credit, and One Valley Bank. The Manning Estate and One Valley Bank withdrew their objections and changed their votes to accept the revised plan based on the debtors' agreement to amend the revised plan in several particulars which were set forth on the record at the hearing on confirmation.

As respects Warrenton Farm Credit's secured claim, the debtors' plan with amendments orally set forth on the record at the confirmation hearing and as described in the modified plan submitted after the hearing, is as follows:

1. The rate of interest on both the Manning Estate's and Warrenton Farm Credit's notes would be reduced to 8% per annum retroactive to January 1, 1994.

2. At confirmation, Warrenton Farm Credit would apply against the indebtedness the debtors' Warrenton Farm Credit stock in the amount of $27,690.00 and debtors' allocated surplus in amount of $7,317.03.

3. Lot 4A would be listed with an independent real estate broker on "reasonable terms and conditions" and sold by the debtors within 18 months (extendable for

---

2. At the time debtors filed their petition, the rate was 8.5%, and at the time of the second confirmation hearing, the rate was 9%.

3. Kline was called by Warrenton Farm Credit, Gorman by the Manning Estate, and LeRoy and McDole by debtors.

60 days if a noncontingent contract of sale is obtained in that period). If the property does not sell within the specified period, Warrenton Farm Credit would be free to enforce its lien by foreclosure.

4. Lot 1 would be listed with an independent broker on "reasonable terms and conditions" and sold by the debtors within 18 months (extendable for 60 days if a noncontingent contract of sale is obtained in that period). The proceeds net of "usual, necessary and reasonable" costs of sale would be paid to the Manning Estate and Warrenton Farm Credit in the order of priority of their liens. The sale would have to be for an amount sufficient to net at least $750,000.00 to the Manning Estate. If Lot 1 does not sell within the specified period, both the Manning Estate and Warrenton Farm Credit would be free to foreclose against all the lots.

5. Debtors must make monthly payments of $3,000.00 per month, increasing by $500.00 every six months to the Manning Estate until Lot 1 is sold. Thereafter, payments would be only be made when a lot is sold.

6. The monthly interest accrual on the Manning Estate notes is $5,500.00 per month and the monthly interest accrual on the Warrenton Farm Credit note is $4,588.54.

7. Lots 2 through 9 would be listed with an independent broker on "reasonable terms and conditions" and sold by debtors over a four year[4] period from October 1, 1994. Lots sales would have to meet the following minimum schedule:

| Months after 10/1/94 | Number of Sales |
| --- | --- |
| 12 | 1 lot or Lot 1 (the house) |
| 24 | Lot 1, if not previously sold or 1 lot, |
| 36 | 2 lots |
| 48 | "balance necessary" |

8. The proceeds from the sale of Lots 2 through 9, net of "usual, necessary and reasonable" costs of sale would go, first to the Manning Estate in the amount of the "release fee" and the balance to Warrenton Farm Credit. Sales would have to be for an amount sufficient to result in an aggregate payment to the Manning Estate and Warrenton Farm Credit, equal to 90% of the fair market value of the lot being sold as set forth in the Gorman appraisal, as described below: [5]

| Lot No. | Manning Release Fee | Warrenton Release Fee |
| --- | --- | --- |
| 1 | $750,000 | $ 0 |
| 2 | 154,328 | 61,672 |
| 3 | 66,957 | 59,033 |
| 4 | 77,351 | 61,249 |
| 4A | 0 | 67,500 |
| 5 | 66,242 | 66,058 |
| 6 | 77,922 | 48,078 |
| 7 | 43,000 | 65,000 |
| 8 | 43,200 | 64,800 |
| 9 | 71,000 | 50,500 |

9. If at any point the debtors fail to meet the schedule of sales for Lots 2 through 9, both the Manning Estate and Warrenton Farm Credit would be entitled to enforce their respective deeds of trust by foreclosing on all the lots (including Lot 1).

At the confirmation hearing Warrenton Farm Credit withdrew its objection to the proposed retroactive reduction in the rate of interest on its claim to 8% and stated that it benefitted more by the reduction of the Manning Estate's notes to the same rate of interest than Warrenton Farm Credit lost in terms of its own interest.

| Lot No. | Kline Appraisal | 90% of Kline | Manning Release | Min to WFC |
| --- | --- | --- | --- | --- |
| 2 | $157,325 | $141,593 | $154,328 | $ 0 |
| 3 | 127,260 | 114,534 | 66,967 | 47,567 |
| 4 | 139,920 | 125,928 | 77,351 | 48,577 |
| 5 | 158,620 | 142,758 | 66,242 | 76,516 |
| 6 | 129,520 | 116,568 | 77,922 | 38,646 |
| 7 | 89,200 | 80,280 | 43,000 | 37,280 |
| 8 | 93,850 | 84,465 | 43,200 | 41,265 |
| 9 | 122,000 | 109,800 | 71,000 | 38,800 |

However, because Warrenton Farm Credit objected to the sales figures based on the Kline appraisal, ironically Warrenton Farm Credit's appraisal, debtors amended their plan to provide for minimum sales based on the Gorman appraisal.

---

4. At the confirmation hearing, the plan proposed payment over five years. However, in addressing Warrenton Farm Credit's objections presented at the hearing, debtors propose a four-year sales period.

5. At the confirmation hearing, the plan proposed that sales would have to be for an amount sufficient to result in an aggregate payment to the Manning Estate and Warrenton Farm Credit, equal to 90% of the fair market value of the lot being sold as set forth in the Kline appraisal, as described below:

### Position of Parties

Warrenton Credit argues that the plan is unfair for two reasons. First, Warrenton Farm Credit argues that no regular payments are provided for with respect to its claim, that it would receive payment only as lots were sold over a five-year period, and that the failure to provide for regular payments, coupled with the fact that the monthly payments to the Manning Estate would be for an amount less than the interest accruing on the Manning Estate's note, results in a negative amortization of the Warrenton Farm Credit's claim.

Second, Warrenton Farm Credit argues that the minimum sales prices proposed by the debtors for Lots 2 through 9 and 4A are insufficient to result in full payment of Warrenton Farm Credit's claim, taking into account the interest that would continue to accrue on the claim, the lengthy marketing period, and the fact that the proposed schedule of lot sales is end-loaded. Warrenton Farm Credit argues that the only justification for holding it at bay for another five years, after the debtors have not made payments for two years, would be the debtors' ability to achieve prices in line with the McDole or LeRoy appraisals, and that, in effect, debtors are asking the Court to confirm a plan that simply allows debtors to speculate with Warrenton Farm Credit's collateral and that places on Warrenton Farm Credit all the risk of a future decline or stagnation in the real estate market.

Debtors argue that the evidence demonstrates that the plan is realistic, fair, and feasible.

### Conclusions of Law

Pursuant to 11 U.S.C. § 1129(a), the court may confirm a debtor's proposed Chapter 11 plan only if all of the elements of 11 U.S.C. § 1129 are met. See 11 U.S.C. § 1129(a). One such criterion found in § 1129(a)(8), requires each class to accept the plan or be unimpaired under the plan.

However, under 11 U.S.C. § 1129(b), a bankruptcy court can confirm a plan of reorganization without creditor approval if the plan "does not discriminate unfairly, and is fair and equitable...." 11 U.S.C. § 1129(b)(1). Under the "fair and equitable" doctrine, the holder of a secured claim must receive "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II); See also Travelers Insurance Co. v. Bryson Properties, XVIII (In re Bryson Properties XVIII), 961 F.2d 496, 500 (4th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992).

■ Warrenton Farm Credit argues that it is not receiving the appropriate periodic cash payments as required under § 1129(b)(2)(A)(i). However, the court notes that the statute does not require the payments to be reliable, periodic cash payments as Warrenton Credit suggests. Instead, the plan need only provide "deferred cash payments totaling at least the allowed amount of such claim...." 11 U.S.C. § 1129(b)(2)(A)(i)(II). The only real question, therefore, concerns the sufficiency of the proposed deferred cash payments.

### Negative Amortization

Warrenton Farm Credit attacks the cash payments because they *could* result in negative amortization in that the monthly payments, absent the sale of lots, would be for an amount less than the interest accruing on the notes.

■ Negative amortization or "deferral of interest" refers to "a provision wherein part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue[,]" with the accrued interest added to the principal and paid when income is higher. In re Club Assocs., 107 B.R. 385, 398 (Bankr.N.D.Ga.1989). Negative amortization depends upon the difference between the "accrual rate," or the overall rate of interest to be paid on a claim, and the "pay rate," or the rate of interest actually to be paid on a monthly basis. See Great Western Bank v. Sierra Woods Group, 953 F.2d 1174, 1176 (9th Cir.1992).

■ Although most courts have been reluctant to adopt a per se rule against negative amortization, courts are hesitant to confirm such plans because the plans tend to place undue risks on creditors. *See In re Club Assocs.,* 107 B.R. at 398–99; *In re Spanish Lake Assocs.,* 92 B.R. 875, 878 (Bankr.E.D.Mo.1988). Therefore, the fairness of such plans are reviewed on a case-by-case determination. *Sierra Woods,* 953 F.2d 1174, 1177. In reviewing the plan involving negative amortization, the court should consider the following factors:

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against plan failure.

*Sierra Woods,* 953 F.2d 1174, 1178.

■ To begin with, the court notes that the Carlton plan does not provide for negative amortization. However, because the plan fails to provide for regular payments to Warrenton Farm Credit, coupled with the fact that the monthly payments to the Manning Estate could likely be for an amount less than the interest accruing on the Manning Estate's note, negative amortization *may* result during the beginning of the plan until debtors sell the lots as scheduled under the plan. In light of the possibility of resulting negative amortization, the court considers the factors enumerated in *Sierra Woods.*

■ In this instance, no evidence was put forward that the 8% interest rate was not a market rate. In fact, Warrenton Farm Credit withdrew its objection to the proposed retroactive reduction in the rate of interest on its claim to 8% because it determined that it benefitted more by the reduction of the Manning Estate's notes to the same rate of interest than it lost in terms of its own interest. In essence, Warrenton Farm Credit concedes that the decreased interest on both notes benefits Warrenton Farm Credit.

The absorption period adopted by the plan is supported by the appraisers' testimonies.

The current debt to value ratio is approximately 1.8/2.5 million. With the possibility of negative amortization, the value of the debt may increase. However, I find the 38% equity cushion is sufficient protection for Warrenton Farm Credit. *See In the Matter of Bouy, Hall and Howard and Assocs.,* 141 B.R. 784, 791 (Bankr.S.D.Ga.1992). In addition, the plan has a built in mechanism that provides for relief from stay if debtors do not sell lots and make sufficient debt payments; therefore, the debt to value ratio can never reach one. Accordingly, throughout the plan, the ratio of debt to value will be satisfactory.

The nature of the collateral is real estate. The evidence before the court is that the collateral is at least stable if not appreciating. Warrenton Farm Credit's own witness testified that the real estate market had been stabilizing for the last six months and that some markets were even increasing. Accordingly, this factor weighs in favor of debtors.

The risks are primarily borne by the Manning Estate and Warrenton Farm Credit. However, the plan proposes adequate safeguards to protect the secured creditors against plan failure and the plan does not preclude foreclosure by either the Manning Estate or Warrenton Farm Credit. If any of the lots does not sell within the specified period, both the Manning Estate and Warrenton Farm Credit would be free to foreclose against all the lots. In addition, the

specified period is not unduly long. Rather, the period is in yearly intervals and allows for foreclosure should debtors default under the plan during any interval.

Based on these factors, the court finds that the plan is fair and equitable even though negative amortization may result.

*Minimum Sales Prices*

■ Warrenton Farm Credit argues that the plan was not submitted in good faith in that the minimum sales prices proposed by the debtors for Lots 2 through 9 and 4A are insufficient to result in full payment of Warrenton Farm Credit's claim, taking into account the interest that would continue to accrue on the claim, the lengthy marketing period, and the fact that the proposed schedule of lot sales is end-loaded.

■ In response to this objection, debtors propose to use the Gorman appraised values as a basis for minimum sales prices, as opposed to the Kline appraised values, and propose to reduce the marketing period from five years to four years. Because this new condition is in response "to and a logical outgrowth of issues raised by the creditor" and relates to an issue which notice and opportunity for a hearing was given, this court considers it as part of the plan. *See Crestar Bank v. Walker (In re Walker),* 165 B.R. 994, 1000 (E.D.Va.1994).

In support of its bad faith objection, Warrenton Farm Credit cites the case of *In re Walker.* In the *Walker* case, the district court denied confirmation, holding that the plan was not proposed in good faith because it:

(1) does not obligate the debtors to make any payments to secured creditors for a period of four years; (2) does not provide a schedule for the liquidation of assets critical to the funding of the plan ...; (3) allows the debtors virtually unfettered discretion in deciding when and how to market assets to be sold ...; and (4) permits the debtors to fund their house payments and living expenses in part from [estate] assets....

*In re Walker,* 165 B.R. 994, 1002.

The *Walker* case differs in significant respects from the instant case. The Carltons'

plan requires that debtors make monthly payments of $3,000.00 per month, increasing by $500.00 every six months to the Manning Estate until Lot 1 is sold. Thereafter, payments would only be made when a lot is sold.

The Carltons' plan provides a schedule for the liquidation of the assets; Lots 2 through 9 shall be listed with an independent broker on "reasonable terms and conditions" and sold by debtors over a five year period from October 1, 1994. Lots sales have to meet a minimum sales schedule and sales have to be for an amount sufficient to result in an aggregate payment to the Manning Estate and Warrenton Farm Credit, equal to 90% of the fair market value of the lot being sold as set forth in the Gorman appraisal. If debtors default under the plan, the Manning Estate and Warrenton Farm Credit would be entitled to enforce their respective deeds of trust by foreclosing on all the lots.

In addition, debtors have demonstrated their good faith by agreeing to increase the minimum sales prices and reduce the marketing period. Although Warrenton Farm Credit has stated that such sales prices are not realistically attainable, Mr. Gorman testified that the sales prices were attainable. Furthermore, if Warrenton Farm Credit is correct that the Kline valuation represents the maximum sales price that could be achieved for the lots, the plan as to Warrenton Farm Credit would terminate early because the Gorman release fees could not be met. Thus, debtors bear the additional risk of foreclose against all the lots upon default.

Because debtors' plan "does not discriminate unfairly, and is fair and equitable[,]" the court will enter an order confirming the plan as submitted on October 5, 1994, and as described above.