FILED

JUN 23 2023

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT



**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>RITA RAMOS CURIEL,<br>                Debtor. | BAP Nos. CC-22-1246-SGF<br>CC-22-1247-SGF<br>(Related Appeals) |
| MARIE HAMILTON, Trustee of the Ken Hamilton Family Trust,<br>                Appellant,<br>v.<br>RITA RAMOS CURIEL; ROBERT P. GOE, Subchapter V Trustee,<br>                Appellees. | Bk. No. 8:22-bk-10175-TA<br><br>**OPINION** |

Appeal from the United States Bankruptcy Court
for the Central District of California
Theodor C. Albert, Chief Bankruptcy Judge, Presiding

APPEARANCES:
Michael G. Spector argued for Appellant; Matthew D. Resnik of RHM Law LLP argued for Appellee Rita Ramos Curiel.

Before: SPRAKER, GAN, and FARIS, Bankruptcy Judges.

SPRAKER, Bankruptcy Judge:

## INTRODUCTION

This appeal requires us to examine feasibility within a chapter 11,

subchapter V[1] case where a secured creditor does not vote to accept the debtor's proposed plan of reorganization. Debtor Rita Ramos Curiel confirmed her plan based largely on statements in her declarations that she could make the required plan payments, including substantial balloon payments to her secured creditors. Both the balloon payments and the monthly plan payments were barely supported by the debtor's projections. Secured creditor Marie Hamilton, as trustee of the Ken Hamilton Family Trust ("Hamilton Trust"), objected to confirmation in large part because Curiel's monthly expenses including plan payments substantially exceeded her income while in bankruptcy. Hamilton Trust also argued that Curiel failed to present any reliable evidence that she would be able to make her monthly or balloon payments. Curiel's ability to make her monthly plan payments overwhelmingly depends on her incorporated business, but no evidence of its finances was provided in support of confirmation.

The bankruptcy court acknowledged that feasibility was a close question but concluded that it was somewhat more likely than not that Curiel would be able to make her payments. Questions abound as to whether stricter scrutiny of feasibility was required under § 1191(c)(3) to establish that the plan was fair and equitable given Hamilton Trust's decision not to accept the plan. Those questions were not addressed at confirmation and elude us on appeal as Hamilton Trust challenges only the

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

bankruptcy court's finding that there was a reasonable likelihood Curiel could make all of her plan payments. But we agree with Hamilton Trust that Curiel's unsupported optimism does not overcome the realities of her case based on the record she presented. For this reason, we REVERSE confirmation of Curiel's subchapter V plan and REMAND for further proceedings, including determination of the applicability of § 1191(c)(3).

Hamilton Trust also appeals from the denial of its relief from stay motion. Because the denial of relief from stay was based on the confirmation of Curiel's plan, we VACATE the order so that the bankruptcy court can consider the motion in light of the denial of plan confirmation and any resulting proceedings.

FACTS[2]

**A.    The bankruptcy filing and Curiel's secured debt.**

Curiel purchased a three-unit residential property on Sycamore Street ("Sycamore Property") in Anaheim, California, and a commercial property on N. East Street ("N. East Property") from Ken Hamilton for $850,000 secured by the two parcels (jointly, "Properties"). As of February 2022, when Curiel filed for bankruptcy, all three units of the Sycamore Property were occupied by paying tenants. The N. East Property was occupied by Curiel's solely owned corporation, Lucky 7 Tire Center, Inc.,

---

[2] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

which operated a tire store on the premises. In her original schedules, Curiel listed liens and judgments encumbering the Properties in excess of $1,500,000. Of this secured debt, she owed $728,227.24 on the purchase note to Hamilton, which had been transferred to Hamilton Trust. Curiel owed $464,100 and $337,500 on separate recorded judgment liens in favor of Michael Daskalakis. Curiel also was liable for property taxes in an unspecified amount owed to the Orange County Treasurer-Tax Collector. Curiel later conceded that the Properties were subject to another judgment lien in favor of the Orange County Transportation Authority for $10,549.

## B. Hamilton Trust's proofs of claim and its Motion for Relief from Stay.

Hamilton Trust filed a proof of claim for $751,581.22, comprised of $728,227.24 in principal, $11,250.00 in attorney fees, $7,541.00 in foreclosure fees, and $4,562.98 for the February 2022 installment.

Hamilton Trust moved for relief from the automatic stay to permit it to proceed to foreclose its security interest against both Properties. It claimed that cause for relief existed on multiple grounds, including that Curiel lacked equity in the Properties and they were not necessary for an effective reorganization under § 362(d)(2). Hamilton Trust also asserted that Curiel impermissibly was attempting to restructure her debt to Hamilton Trust because its loan had matured and become fully due and payable prepetition, as of December 11, 2020.

Hamilton Trust calculated its secured claim as of the time of the

motion at $767,270.17 and adopted from Curiel's schedules the aggregate amount owed to Daskalakis of $801,600.[3] Combined, the total aggregate secured debt against the two Properties (excluding county tax debts and liens) was $1,568,870. Hamilton Trust also adopted the scheduled aggregate value of the Properties of $1,225,000.

In her opposition to the relief from stay motion, Curiel originally admitted she had no equity in the Properties but contended that both were necessary for an effective reorganization in prospect. Meanwhile, Curiel also moved to value both parcels of real property. Based on appraisals offered by Curiel which were not opposed, the court valued the N. East Property at $915,000 as of June 3, 2022 and valued the Sycamore Property at $615,000 as of that same date. Thus, the court determined the aggregate value of the Properties as of June 3, 2022, to be $1,530,000.

Ultimately, the court denied the motion for relief from stay at the conclusion of the final confirmation hearing in December 2022.

In October 2022, Hamilton Trust filed an amended proof of claim for $782,971.77. The amended proof of claim included accrued interest at the contract rate of 5%, plus attorney fees incurred, less adequate protection payments that Curiel made.

---

[3] According to Curiel, the $337,500 judgment lien was partially satisfied. Curiel scheduled the revised balance of the debt at $157,500 in her Plan (defined below) and confirmation brief, so we use this as the outstanding loan balance. Based on the substantial reduction in this judgment and the appraised values, Curiel contended that she had equity in her Properties.

## C. Curiel's Plan and confirmation.

### 1. Terms of the Plan.

Curiel's operative plan was her second amended plan, which she filed in September 2022 ("Plan"). The Plan estimated her debts and proposed the following monthly payments totaling $12,050:

| | Class | Amount of Claim | Monthly Payment | Terms |
|---|---|---|---|---|
| **Administrative Expenses** | | | | |
| Debtor's Counsel | | $ 35,000 | $ 571 | $20,000 paid on effective date, balance monthly |
| Subchapter V Trustee | | $ 15,000 | | Paid on effective date |
| **Secured Debts** | | | | |
| Hamilton Trust | 1 | $ 751,582 | $ 5,779 | Payments amortized over 30 years, payable in 7 years, interest at 8.5% |
| Daskalakis Abstract (Judgment) #1 | 2 | $ 157,500 | $ 1,212 | Payments amortized over 30 years, payable in 7 years, interest at 8.5% |
| Daskalakis Abstract (Judgment) #2 | 3 | $ 464,100 | $ 3,569 | Payments amortized over 30 years, payable in 7 years, interest at 8.5% |
| Orange County Transportation | 4 | $ 10,550 | $ 82 | Payments amortized over 30 years, payable in 7 years, interest at 8.5% |
| Orange County Tax Collector | 5 | $ 8,945 | $ 373 | Payable in 5 years interest at 18% |
| **Priority Debts** | | | | |
| Internal Revenue Service | | $ 7,470 | $ 163 | Payable at 5% interest over 5 years |
| Cal. Franchise Tax Board | | $ 5,515 | $ 121 | Payable at 5% interest over 5 years |
| **General Unsecured Claims** | | $ 10,755 | $ 180 | Not applicable |
| **TOTALS** | | **$1,466,417** | **$ 12,050** | |

Her Plan also stated that she had $3,140 in personal monthly expenses, and expenses for the Properties, including real property taxes and insurance, averaged an additional $2,569 per month. Altogether, Curiel

6

projected that her total monthly expenses between her personal, real property, and plan payments would total $17,759.

Curiel explained that she based her projected monthly income and personal expenses largely on her historical cash flow amounts as reflected in her monthly chapter 11 operating reports ("MORs"). She projected that her net income would support her Plan payments and the feasibility of her Plan and that she would "be able to meet all my financial obligations under the Plan." She estimated her monthly income at just under $18,000. Curiel calculated her monthly income based on $695 per month from Social Security, $8,700 in rents from the Properties, $4,500 for her wages from Lucky 7, and at least $3,000 from her nondebtor partner Israel Guerrero-Hernandez, who also worked at Lucky 7.

The proposed Plan relied on significant balloon payments to pay off the remaining secured debt at the end of the Plan, including those owed to Hamilton Trust and Daskalakis. Curiel explained that the balloon payments would be funded by a refinancing or sale of the Properties.

### 2. Hamilton Trust's objections to the Plan.

Hamilton Trust objected to the Plan. It argued that the Plan inappropriately attempted to extend a loan that fully matured before Curiel filed bankruptcy. According to the Hamilton Trust, Curiel's Plan could not be confirmed unless she proposed to cure the payment default in accordance with the loan's original terms, and the only way to cure a default from a loan that fully matured prepetition was for the debtor to pay

the entire outstanding balance on the Plan's effective date. Because the Plan did not provide for full payment of its loan on the effective date, Hamilton Trust reasoned that it would be free to foreclose after confirmation.

Hamilton Trust also argued that the Plan was not feasible. It noted that during the bankruptcy, Curiel had reported an average of $12,581 in monthly income, far short of the monthly income necessary to fund the Plan. Hamilton Trust also noted that Curiel's monthly income was heavily dependent on Lucky 7, as it paid not only the N. East Property rent but also both Curiel's and Hernandez's wages. Hamilton Trust submitted the 2021 financial statements for Lucky 7 that disclosed losses of nearly $20,000 during calendar year 2021, while paying officer wages to Curiel of only $31,200, or $2,600 per month. It questioned how Curiel reasonably could expect to derive $4,500 per month in employment income from Lucky 7 during the entire Plan period.

Hamilton Trust acknowledged that Lucky 7 had borrowed $399,000 from the Small Business Administration ("SBA") roughly a month before Curiel filed her bankruptcy. Curiel had offered that Lucky 7's loan could be used to fund any shortfall in her Plan. Hamilton Trust noted that Curiel had failed to disclose her personal guaranty of the SBA loan. It also stated that as of the date she proposed her Plan, Curiel admitted that Lucky 7 only had $316,000 from the loan on hand. According to Hamilton Trust, Lucky 7's use of $83,000 over the prior seven months suggested that it was using the SBA loan proceeds at roughly $12,000 per month ($399,000-

8

$316,000 ÷ 7 = \$11,857.14$). Hamilton Trust argued that Lucky 7 would need to use significant amounts of the SBA loan to pay both Curiel and Hernandez in amounts sufficient to enable them to honor their Plan commitments. It concluded that Lucky 7 would burn through the remaining loan proceeds in a matter of months—leaving Lucky 7 with no apparent means of paying Curiel's and Hernandez's increased salary demands over the entire Plan term.[4]

Hamilton Trust additionally argued that the Plan was not feasible because Curiel had failed to demonstrate a reasonable likelihood that she would be able to sell or refinance the Properties as the Plan contemplated, which was the only means by which Curiel could fund the Plan's balloon payments. According to Hamilton Trust, at least some equity in the Properties was essential to any proposed refinance or sale, and Curiel presented no evidence suggesting that she would have equity at the end of the Plan term. Hamilton Trust further posited that the Properties were losing value rather than appreciating, because of the rise in interest rates.

### 3. Curiel's confirmation brief and reply to Hamilton Trust's objection to confirmation.

Curiel filed supplemental declarations and a brief in support of Plan confirmation together with the results of the creditors' ballots. The only

---

[4] Hamilton Trust made several other arguments challenging the Plan, such as the Plan was not proposed in good faith. But none of these other arguments have been pursued on appeal.

creditor to return a ballot was Hamilton Trust and it rejected the Plan. Accordingly, no class of impaired creditors, including the unsecured creditors, accepted the Plan. Curiel acknowledged that she did not satisfy either § 1129(a)(8) or (10) and sought confirmation for a nonconsensual plan under § 1191(b).

In response to Hamilton Trust's objections, Curiel characterized as frivolous the argument that a matured loan could not be modified and extended as part of a proposed plan. Curiel distinguished the case law Hamilton Trust relied on and pointed to the bankruptcy court's comments in the relief from stay proceedings indicating that such modifications were permissible. Both her brief and declaration, however, recognized Hamilton Trust's amended proof of claim in the amount of $782,971, without stating any objection.

As for feasibility, Curiel claimed that she had minimal equity of $5,454 at the time of filing her supplemental brief. This included Hamilton Trust's amended claim amount, but Curiel deducted the adequate protection payments to the Daskalakis judgment liens from the principal owed without explaining why those payments should not be applied to interest. More importantly, Curiel claimed that by the time her balloon payments became due, she would have paid down the principal owed to each secured creditor in sufficient amounts that she would have sufficient equity to sell or refinance—regardless of whether the Properties appreciated in value. Using the aggregate value of $1,530,000 established

by the court's order granting her motions to value the Properties, she contended that she should have equity of roughly $228,738 when the balloon payments came due based on her calculation that the balance of secured debt would total $1,301,262.12 in January 2029.[5] Curiel also disputed that the Properties were decreasing in value because of rising interest rates. She further claimed that any decrease in value was offset by certain utility easements that she granted as to both Properties postpetition (with court approval), which she claimed increased the Properties' value by "greatly" improving their access to and use of the utilities.

With respect to her ability to fund the monthly Plan payments and pay her other expenses during the Plan term, she also submitted a declaration from Hernandez stating that he would contribute at least $3,000.00 per month to Curiel's Plan. Hernandez explained that he has historically been paid in cash but that he had been sharing household expenses with Curiel for many years. He attached a photo of a balance inquiry showing $4,578.07 in a Chase account as of November 22, 2022.

Curiel also reiterated many of the same points she previously made in support of the Plan. She asserted that her DIP bank account balance of $62,999.95 and Lucky 7's bank account balance of $266,983.59 were solid evidence of her ability to fund her Plan payments. She argued this was particularly relevant as she had no such bank balance at the time of her

---

[5] Curiel's calculation, therefore, was based on balloon payments being made six years after the projected effective date though her Plan provided a seven-year term.

bankruptcy filing.

**4.    Additional filings and the court's confirmation of the Plan.**

Three additional filings are pertinent to the Plan confirmation proceedings. First, Hamilton Trust filed evidentiary objections to most of the statements made in Curiel's and Hernandez's declarations in support of her Plan confirmation brief. In relevant part, Hamilton Trust objected that neither Curiel nor Hernandez had laid a proper foundation as to their personal knowledge regarding Lucky 7's ability to pay them income during the Plan term in amounts sufficient to enable them to fully fund Curiel's Plan obligations. Nor had they established their qualifications as experts capable of rendering valid opinions regarding the status of and prospects for Curiel's, Hernandez's, and Lucky 7's finances, or how the value of the Properties might change over time.

Second, the subchapter V trustee filed a statement in support of confirmation of the Plan. The trustee opined that the Plan appropriately treated Hamilton Trust's claim, though she opined that the due date for the balloon payments should be reduced from 7 years to 3-5 years. The trustee further suggested that the bank balances both Curiel and Lucky 7 had managed to accumulate during the pendency of the bankruptcy supported both the feasibility of the Plan and Plan confirmation.

Third, and finally, after the court advised Curiel that it would prefer to hear from the SBA before making its final decision on Plan confirmation, Curiel negotiated and entered into a stipulation with the SBA stating that:

12

(1) SBA's loan and guaranty rights would not be modified or affected by the Plan or by the parties' stipulation; (2) though Curiel had contingent liability as a guarantor of the loan SBA made to Lucky 7, SBA's guaranty claim had not matured because Lucky 7 was not obligated to begin making monthly payments on the loan until January 2024; and (3) subject to the above terms, SBA consented to the Plan.

At the final hearing on Plan confirmation, the bankruptcy court summarily overruled the evidentiary objections and rejected Hamilton Trust's arguments challenging the Plan's feasibility. The court specifically asked Curiel, "[w]here in the record is there, in your view, sufficient evidence that the Debtor can actually make the [Plan] payments as promised?" In response, Curiel pointed to her MORs as evidence of sufficient income. Curiel noted that her MORs demonstrated that she had "stayed current" with her adequate protection payments to both Hamilton Trust and Daskalakis. She also noted that she had stayed current on her personal expenses and still managed to increase cash on hand in her debtor-in-possession bank account from $3,100 at the start of the case to roughly $62,000 as of the time of the hearing.

After considering the parties' arguments, the court observed that feasibility presented a very close question, but it ultimately found that it was more likely than not that Curiel's Plan was feasible. Though the court remarked that it would have been happier if Curiel had provided "more extensive projections," it found that "it's somewhat more likely than not

that she can do this . . . ." The court further commented, "I agree this is a close question. It's not an obvious case, but I think it's just at the 50-yard line plus an inch. And that's all it has to be, I guess." The court specifically found that the Plan was feasible and confirmed the Plan—modified to require the balloon payments of the secured creditors' claims within 60 months of the effective date. Based on confirmation of the Plan, the court also denied Hamilton Trust's relief from stay motion. Hamilton Trust timely appealed both orders.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(G) and (L). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Whether the Bankruptcy Code permits debtors in a reorganization plan to modify and extend repayment of a debt secured by real estate if that debt arises from a loan that fully matured before the bankruptcy was filed.

2. Whether Curiel's Plan was feasible.

3. Whether the bankruptcy court incorrectly overruled Hamilton Trust's evidentiary objections.

4. Whether the bankruptcy court abused its discretion when it denied Hamilton Trust's relief from stay motion.

## STANDARDS OF REVIEW

Hamilton Trust's appeal requires us to interpret the Bankruptcy

14

Code. Questions of statutory interpretation are reviewed de novo. *Kashikar v. Turnstile Capital Mgmt., LLC (In re Kashikar)*, 567 B.R. 160, 164 (9th Cir. BAP 2017). When we review a matter de novo, we give no deference to the bankruptcy court's ruling. *Id.*

We generally review the bankruptcy court's feasibility finding for an abuse of discretion. *First S. Nat'l Bank v. Sunnyslope Hous. Ltd. P'ship (In re Sunnyslope Hous. Ltd. P'ship)*, 859 F.3d 637, 647 (9th Cir.) (en banc), *as amended* (June 23, 2017). To the extent the feasibility finding arose from factual inferences the bankruptcy court made about the financial condition and future prospects of Curiel and Lucky 7, however, we review those inferences under the clearly erroneous standard and give them due deference. *See Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC)*, 465 B.R. 525, 544 (9th Cir. BAP 2012) (citing *Wiersma v. O.H. Kruse Grain & Milling (In re Wiersma)*, 324 B.R. 92, 112–13 (9th Cir. BAP 2005), *aff'd in part, rev'd in part on other grounds*, 227 F. App'x 603 (9th Cir. 2007)), *aff'd*, 578 F. App'x 644 (9th Cir. 2014). A bankruptcy court's factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc).

We review evidentiary rulings for an abuse of discretion, and we only reverse them if they more likely than not affected the outcome of the litigation. *Van Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 351-52 (9th Cir. BAP 2012), *aff'd*, 604 F. App'x 552 (9th Cir. 2015).

We also review for abuse of discretion the bankruptcy court's denial of Hamilton Trust's relief from stay motion. *Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal)*, 450 B.R. 897, 914 (9th Cir. BAP 2011). The bankruptcy court abused its discretion if it applied an incorrect legal rule or its factual findings were illogical, implausible, or without support in the record. *TrafficSchool.com v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011).

**DISCUSSION**

Hamilton Trust challenges both the bankruptcy court's confirmation order and its denial of relief from stay. We address each order separately.

**A. Appeal from confirmation order.**

According to Hamilton Trust, Curiel's Plan impermissibly modified and extended the secured debt she owes to it, which fully matured prior to her bankruptcy filing. Hamilton Trust maintains that the only permissible treatment for its secured debt was payment in full on the Plan's effective date. Hamilton Trust also contests the bankruptcy court's finding of feasibility. In conjunction with its feasibility arguments, Hamilton Trust asserts that the court incorrectly overruled its evidentiary objections.

**1. Extension of Hamilton Trust's secured debt.**

With certain exceptions not relevant here, a chapter 11 debtor's plan may modify the rights of secured creditors. Section 1123(a)(5)(E) says that a plan may provide for the "satisfaction or modification of any lien." Section 1123(b)(5) further specifies that a chapter 11 plan may "modify the rights of holders of secured claims, other than a claim secured only by a

16

security interest in real property that is the debtor's principal residence." *See In re Brock*, 628 B.R. 509, 510 (Bankr. N.D. Miss. 2021) (explicating § 1123(b)(5)).

There are exceptions to, and restrictions on, the general rule permitting modification. For instance, a chapter 11 debtor cannot modify the rights of a secured creditor whose collateral consists solely of the debtor's principal residence. *Id.* In addition, if the plan alters "the legal, equitable, and contractual rights" of the secured creditor, the secured creditor is considered impaired under § 1124(1) and entitled to additional rights and protections as set forth in § 1129. Although subchapter V might alter the chapter 11 debtor's right to modify secured claims, none of those differences are relevant to this appeal. *See generally* Hon. Paul W. Bonapfel, *A Guide to the Small Business Reorganization Act of 2019*, at 115-16 (Rev. June 2022) ("*SBRA Guide*"), https://www.alsb.uscourts.gov/sbra-materials (click on "SBRA guide (Judge Paul Bonapfel, 338 pp.) (updated June 2022)") (last visited June 20, 2023) (explaining differences in modification rights under § 1123(b)(5) and § 1190(3)).

Notwithstanding the plain language of the Bankruptcy Code, Hamilton Trust argues that it was impermissible to confirm a plan enabling Curiel to make monthly payments of $5,779 on its claim and then make a balloon payment for the substantial remaining balance five years later. According to Hamilton Trust, the "only thing a plan can do to 'cure' a

default of a fully matured debt is to provide for full payment of the debt on the effective date of the Plan."

To support this proposition, Hamilton Trust primarily relies on three decisions: (1) *Great Western Bank & Trust v. Entz-White Lumber & Supply, Inc. (In re Entz-White Lumber & Supply, Inc.)*, 850 F.2d 1338 (9th Cir. 1988), *partially abrogated on other grounds by Pacifica L 51 LLC v. New Investments, Inc. (In re New Investments, Inc.)*, 840 F.3d 1137 (9th Cir. 2016); (2) *In re Liberty Warehouse Associates Ltd. Partnership*, 220 B.R. 546 (Bankr. S.D.N.Y. 1998); and (3) *United States Trust Co. of New York v. LTV Steel Co (In re Chateaugay Corp.)*, 150 B.R. 529 (Bankr. S.D.N.Y. 1993), *aff'd*, 170 B.R. 551 (S.D.N.Y. 1994). But none of these decisions help Hamilton Trust. All three cases dealt with the interest rate a chapter 11 debtor must pay in the process of curing or reinstating a loan in default. None of them specifically addressed whether or how a chapter 11 plan can extend repayment of a loan that matured prepetition.

Hamilton Trust's argument is fundamentally unsound. It conflates the concept of curing a default with the concept of modifying a secured creditor's contractual rights. Though neither the term "cure" nor the term "modify" are defined in the Bankruptcy Code, the two concepts are distinct. As one bankruptcy court recently explained:

> A modification of a loan is a fundamental alteration in a debtor's obligations, e.g., lowering monthly payments, converting a variable interest rate to a fixed interest rate, **or extending the repayment term of a note**. By contrast, a "cure" merely reinstates a debt to its pre-

18

> default position, or it returns the debtor and creditor to their respective positions before the default. A cure will remedy or rectify the default and restore matters to the status quo ante. Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences [of default] are thus nullified.

*In re Jacobs*, 644 B.R. 883, 900 (Bankr. D. N.M. 2022) (cleaned up) (emphasis added). Further emphasizing the distinction between the two actions, cure of defaults is subject to different provisions of the Code than modifications. *Compare* § 1123(a)(5)(E) and (b)(5) *with* §§ 1123(a)(5)(G) and 1124(2)(A).

The only other decisions Hamilton Trust cites in support of its position are: (1) *Seidel v. Larson (In re Seidel)*, 752 F.2d 1382, 1383 (9th Cir. 1985); and (2) *Greenberg v. Champion Mortgage Co. (In re Greenberg)*, 622 B.R. 60 (S.D. Cal. 2020)**.** Neither of these decisions help Hamilton Trust any more than *Entz-White, Liberty Warehouse Assocs.*, or *Chateaugay* help it. *Seidel* and *Greenberg* are based on the restrictions set forth in § 1322(b)(2) and § 1123(b)(5), which respectively prohibit chapter 13 and chapter 11 debtors from modifying the rights of secured creditors whose debts are secured solely by the debtor's principal residence. Hamilton Trust's claim is not secured by Curiel's residence. Thus, these two decisions are inapposite.[6]

---

[6] *Seidel* is helpful analytically in one limited respect. It makes clear that a chapter 13 plan provision proposing to repay a fully matured home loan over the term of the plan constitutes a modification of a secured debt subject to the restrictions of § 1322(b)(2). *In re Seidel*, 752 F.2d at 1383-86. Thus, *Seidel* is fundamentally inconsistent with any notion that such secured debts lose their status as home loans protected by § 1322(b)(2)'s anti-modification provision because the debt fully matured prior to the

Hamilton Trust attempts to write an exception to the chapter 11 debtor's statutory authority to modify secured creditor rights for loans that mature prepetition. The statutory text does not contemplate such an exception. The final enactments codified as § 1322(b)(2) and § 1123(b)(5) evidently were the result of Congress's protracted consideration of competing policy concerns and represent its best efforts to balance the rights of debtors and secured creditors in bankruptcy. *Cf. In re Seidel*, 752 F.2d at 1385-86; *In re Brock,* 628 B.R. at 510. We will not second-guess Congress's carefully crafted statutory scheme.

## 2. Feasibility.

### a. The applicable standards for feasibility.

To confirm a subchapter V plan, all the requirements set forth in § 1129(a) must be met, other than the requirement imposed on individual debtors to commit their disposable income over five years. § 1191(a). Section 1129(a)(11) requires the debtor to prove that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This feasibility requirement is a critical factor for every proposed chapter 11 plan. *See In re Bashas' Inc.*, 437 B.R. 874, 915 (Bankr. D. Ariz.

bankruptcy filing. Indeed, in *Seidel* the conversion of the secured creditor's rights from security interest into a post-foreclosure judgment lien did not render § 1322(b)(2) inapplicable. *Id.* at 1386-87.

2010) (stating that feasibility "is the most important element of § 1129(a)").

In the Ninth Circuit, a plan is feasible under § 1129(a)(11) if the plan

proponent demonstrates that the plan "has a reasonable probability of

success." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1364 (9th

Cir. 1986). It is well settled that a debtor is not required "to prove that

success is inevitable[.]" *Comput. Task Grp., Inc. v. Brotby (In re Brotby)*, 303

B.R. 177, 191 (9th Cir. BAP 2003) (citing *In re WCI Cable, Inc.,* 282 B.R. 457,

486 (Bankr. D. Or. 2002)). The Ninth Circuit has explained that the purpose

of the feasibility requirement "is to prevent confirmation of visionary

schemes which promise creditors and equity security holders more under a

proposed plan than the debtor can possibly attain after confirmation." *Pizza*

*of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382

(9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11] (15th ed.

1984)).

If all classes of creditors vote to accept the subchapter V plan, the

debtor need not prove anything more than she is reasonably likely to be

able to perform her plan obligations as required under § 1129(a). But where

one or more classes of impaired creditors do not accept the plan and

§ 1129(a)(8) or (10) are not met, a court may confirm the plan only if it

"does not discriminate unfairly, and is fair and equitable, with respect to

each class of claims or interests that is impaired under, and has not

accepted, the plan." § 1191(b). Because no creditors accepted or voted for

21

the Plan, Curiel did not satisfy the requirements of § 1129(a)(8) or (10) and was required to cramdown the plan under § 1191(b).

Section 1191(c) states the "[r]ule for construction" for purposes of § 1191(b) and determining whether a "plan is fair and equitable with respect to each class of claims or interests." It sets forth the three minimum requirements a subchapter V cramdown plan must meet to be considered "fair and equitable." First, it incorporates the requirements of § 1129(b)(2)(A) for secured claims. § 1191(c)(1). Second, the plan must provide the required disposable income. § 1191(c)(2). Third, the debtor must prove either that she "will" be able to make all payments under the plan, or there is a reasonable likelihood she will make all plan payments and appropriate remedies are provided in the event of a default.[7] § 1191(c)(3).[8] This third requirement requires a harder look at feasibility than otherwise conducted under § 1129(a)(11) alone.[9] *In re Samurai Martial*

___

[7] The bankruptcy court is not limited to the three enumerated requirements set forth in § 1191(c). The subsection states that whether the plan is fair and equitable **includes** those requirements. Because the term "includes" is not limiting, a court may consider other relevant factors as well. § 102(3).

[8] As originally enacted, § 1191(c)(3)(A) included both tests for feasibility, while § 1191(c)(3)(B) added the requirement for appropriate remedies in the event of a default. The Bankruptcy Threshold Adjustment and Technical Corrections Act, Pub. L. No. 117-151, § 2(f), 136 Stat. 1298, 1299 (2022) (hereinafter "BTATCA") separated the standards for feasibility and now requires proof of appropriate remedies only where the debtor proves a reasonable likelihood that she will make the plan payments. This provision of BTATCA applies retroactively to cases, such as this one, that were commenced on or after March 27, 2020, and were pending on the effective date of June 21, 2022. BTATCA § 2(h)(2).

[9] Section 1191(c)(3)(A) is the more stringent of the two alternatives as it requires

*Sports, Inc.*, 644 B.R. 667, 698 (Bankr. S.D. Tex. 2022) (feasibility under § 1191(c)(3) differs from "the more relaxed feasibility test that § 1129(a)(11) contains."); *In re Pearl Res. LLC,* 622 B.R. 236, 269-70 (Bankr. S.D. Tex. 2020); *SBRA Guide* at 157.

In this instance, neither § 1129(a)(8) nor (a)(10) were satisfied, and Curiel was forced to cramdown her Plan under § 1191(b). Hamilton Trust does not contend that Curiel's Plan was unfairly discriminatory, that it failed to meet the requirements of § 1129(b)(2)(A), or that Curiel did not commit the required disposable income under § 1191(c)(2). The parties' citations to § 1191(b) and (c)(3) suggest that they understood the bankruptcy court was required to perform a more rigorous examination of feasibility to determine if the Plan was fair and equitable under the requirements set forth in § 1191(c). They do not, however, address the applicability of the different standards provided by § 1191(c)(3)(A) and (B).[10]

---

that the subchapter V debtor show that she "will" be able to make all the required payments. *See In re Channel Clarity Holdings LLC*, 2022 WL 3710602, at *16 (Bankr. N.D. Ill. July 19, 2022); *SBRA Guide* at 157. Alternately, a debtor can still show that it is reasonably likely she will be able to make all payments, but she must now also show that the plan includes "appropriate remedies" in the event of default. Thus, § 1191(c)(3)(B) also requires more than § 1129(a)(11) alone. *SBRA Guide* at 157.

[10] Judge Bonapfel has cautioned in the *SBRA Guide*: "It is unclear whether the additional requirements [§ 1191(c)(2) and (c)(3)] apply when only the secured creditor rejects the plan." *SBRA Guide* at 140 (cleaned up). At least two bankruptcy courts have applied the disposable income requirement imposed by § 1191(c)(2) and the feasibility/remedy requirement of § 1191(c)(3) as additional factors to the fair and equitable test to nonconsenting secured creditors under § 1191(b). *In re Pearl Res. LLC,*

On appeal, Hamilton Trust argues only that Curiel failed to prove the feasibility of her Plan, without discussing the applicable standard. It does not question the appropriateness of the Plan remedies upon default.[11] Nor did it argue that Curiel was required to prove that she "will" be able to make her Plan payments under the more stringent requirements of § 1191(c)(3)(A). We, therefore, turn to the limited question presented on appeal as to Plan feasibility: whether Curiel proved that she is reasonably likely to be able to make her Plan payments. Hamilton Trust has forfeited any other arguments on feasibility by not specifically and distinctly raising them. *Christian Legal Soc'y v. Wu*, 626 F.3d 483, 487–88 (9th Cir. 2010);

---

622 B.R. at 267-69; *In re Moore & Moore Trucking, LLC,* 2022 WL 120189, at *6-7 (Bankr. E.D. La. Jan. 12, 2022). In this instance, however, § 1191(c)(3) was clearly invoked because no class of creditors, including the unsecured creditors, accepted the Plan.

[11] Curiel's Plan provided that in the event of a default Hamilton Trust could serve a notice of default and give Curiel at least sixty days to cure the default. If the default was material, Hamilton Trust "may: (i) take any action permitted under bankruptcy or non-bankruptcy law to enforce the terms of the Plan; (ii) seek liquidation of nonexempt assets pursuant to § 1191(c)(3)(B); (iii) seek to remove the Debtor as a DIP; and/or (iv) move to dismiss this case or to convert this case to Chapter 7 pursuant to § 1112(b)." We note the dearth of cases discussing what are, or are not, appropriate remedies under § 1191(c)(3)(B)(ii). But we agree with the bankruptcy court's observation in *In re Channel Clarity Holdings LLC,* 2022 WL 3710602, at *16, that merely allowing creditors to "pursue remedies under applicable law if Debtor should default is a toothless remedy." The requirement under § 1191(c)(3)(B)(ii) that the remedies provided be "appropriate" suggests that they should be tailored to the situation. Curiel could bolster the default remedies to provide for a prompt auction of the Properties, a stipulated foreclosure, or an automatic deed in lieu of foreclosure. The prospect of an immediate, certain, and inexpensive remedy would increase Curiel's incentive to obtain funding for the balloon payment and decrease the prejudice to Hamilton Trust if she is not successful.

*Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010). Even under this less restrictive standard, we conclude that confirmation was clearly erroneous.

### b.    Ability to make monthly Plan payments.

It is Curiel's burden, as the Plan proponent, to present concrete evidence to establish that she has sufficient cash flow to maintain her ongoing personal expenses while funding all Plan payments. *See In re Pizza of Haw., Inc.,* 761 F.2d at 1382; 7 Collier on Bankruptcy ¶ 1129.02 (16th ed. 2023). And while feasibility under § 1129(a) presents a relatively low threshold, it still depends on adequate evidence. *Legal Serv. Bureau, Inc. v. Orange Cnty. Bail Bonds, Inc., (In re Orange Cnty. Bail Bonds, Inc.),* 638 B.R. 137, 148 (9th Cir. BAP 2022) (citing *In re Brotby*, 303 B.R. at 191). To this end, "[f]actual support must be shown for the Debtor's projections." *In re Hobble-Diamond Cattle Co.,* 89 B.R. 856, 858 (Bankr. D. Mont. 1988). "The use of the word 'likely' in Section 1129(a)(11) requires the Court to assess whether the plan offers a reasonable 'probability of success, rather than a mere possibility.'" *In re Sanam Conyers Lodging, LLC,* 619 B.R. 784, 789 (Bankr. N.D. Ga. 2020) (quoting *In re Aspen Vill. at Lost Mountain Memory Care, LLC,* 609 B.R. 536, 543 (Bankr. N.D. Ga. 2019)). Thus, "[t]he mere fact that the bare numbers in the income and expense projections provided in the plan demonstrate an apparent surplus to adequately fund the plan is not enough to meet the burden on feasibility." *In re Kowalzyk*, 2006 WL 3032145, at *5 (Bankr. D. Minn. 2006).

Curiel relies heavily on her own statements, submitted in her declarations, that she can perform her Plan obligations and that she will be able to refinance or sell the Properties to make the balloons payments. She also submitted a brief declaration from Hernandez that he would contribute at least $3,000 per month towards Curiel's Plan payments. Neither Curiel, nor Hernandez, were cross-examined by Hamilton Trust. Instead, Hamilton Trust contends that the declarations are contradicted by her historical income while in bankruptcy. It also argues that the absence of any meaningful evidence as to the finances of either Hernandez or Lucky 7 should preclude Curiel from relying on these sources of income to prove she will be able to make her monthly Plan payments.

Hamilton Trust takes particular issue with Curiel's dependence on Lucky 7 in general and on the proceeds from its SBA loan in particular. It notes that $14,000 of Curiel's projected monthly income of $18,000, or 78% of her total income, comes from Lucky 7 directly or indirectly. Curiel also admits that the SBA loan proceeds diminished from $399,000 in February 2022 to $266,983.59 when she filed her brief in support of confirmation on November 23, 2022. Hamilton Trust argued this reflected that Lucky 7 was using more than $16,000 per month at the time of confirmation. Curiel disagreed with Hamilton Trust's characterization of Lucky 7's use of the SBA loan proceeds as evidence of a monthly "burn rate," but she admitted that Lucky 7 had used some of the proceeds "as operating capital and to pay down some of its existing debt." She did not, however, provide any

26

evidence or details concerning Lucky 7's current finances or use of the SBA loan proceeds.

The only evidence of Lucky 7's finances in the record came from Hamilton Trust, not Curiel. As part of its confirmation objection, Hamilton Trust submitted a Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest previously filed by Curiel for Lucky 7 in September 2022. The report disclosed the balance sheet for Lucky 7 as of December 31, 2021, attached to its federal tax return, which showed a negative cash balance and a loan to shareholder as its only assets. The report also attached a profit and loss statement as of December 2021, which showed a loss of $19,951.05. Curiel discounted the relevance of the financials as skewed by the Covid pandemic. But there is no evidence of Lucky 7's financial performance in 2022, apart from its receipt of the SBA loan. Curiel has also downplayed the significance of Lucky 7's obligation to repay the SBA loan, noting that its $1,916 monthly loan payments do not start until January 2024. Again, however, there is no evidence in the record showing how the SBA loan repayments may affect Lucky 7's finances, much less its ability to underwrite Curiel's Plan over the five-year term.

The absence of any evidence regarding Lucky 7's finances, including the SBA loan proceeds, is only magnified by the problems surrounding Curiel's financial evidence supporting feasibility. Both Curiel and the court relied on the MORs to support their feasibility arguments. MORs are

recognized as "the life blood" of chapter 11, "enabling creditors to keep tabs on the debtor's post-petition operations." *In re Aurora Memory Care, LLC*, 589 B.R. 631, 639 (Bankr. N.D. Ill. 2018) (citing *In re Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991)). Courts regularly scrutinize the debtor's MORs to gauge the feasibility of a proposed plan. *See, e.g., In re Hao*, 644 B.R. 339, 348 (Bankr. E.D. Va. 2022); *In re Allied Consol. Indus., Inc.*, 569 B.R. 284, 293-94 (Bankr. N.D. Ohio 2017); *In re Augusto's Cuisine Corp.*, 2017 WL 1169537, at *10-11 (Bankr. D.P.R. Mar. 28, 2017); *In re Mangia Pizza Invs.*, LP, 480 B.R. 669, 703 (Bankr. W.D. Tex. 2012).

The bankruptcy court agreed with Curiel that her accumulation of cash reserves reflected in her MORs over the course of her bankruptcy provided evidence that her financial condition had improved and supported her ability to perform her Plan obligations. Yet, some further examination is required. Curiel was paying her secured creditors roughly half of her Plan obligations. As Hamilton Trust's amended claim showed, the $3,000 per month adequate protection payments it was receiving were insufficient to cover the accruing postpetition interest, albeit barely. And because Curiel concedes that Hamilton Trust is an oversecured creditor, its claim increased over the course of the bankruptcy by a small amount of postpetition interest (accruing at 5%), together with other charges and attorney fees. *See* § 506(b). Similarly, her combined payments to Daskalakis increased from $2,000 per month in adequate protection to $4,781 per month under the Plan. It is unclear whether the $2,000 adequate protection

28

payment was sufficient to cover all of the interest accruing on Daskalakis' two judgment liens, or if those secured claims increased during the pendency of the bankruptcy as well. Regardless, the net effect of the Plan obligations was to eliminate Curiel's monthly cash cushion by which she accumulated her cash reserve. Moreover, Curiel committed $35,000 of this reserve to pay the trustee's administrative expense in full and $20,000 toward her counsel's fees on the effective date.

Curiel's monthly Plan obligations totaled $12,050, without adjusting for Hamilton Trust's amended claim. She disclosed that her personal monthly expenses, including expenses for the Properties, totaled an additional $5,647. Her projected monthly expenses, therefore, totaled $17,697. Curiel projected that she would have monthly income of $17,895 to satisfy these expenses and Plan payments. Thus, even under her own projections, she had only $198 in net monthly income at the beginning of her Plan payments. Over the first three years of the Plan, she projected that her net monthly income would fluctuate between $95 and $252 per month until she paid off her attorney fees. She also expected that her monthly net income would increase from $584 to $601 over the last two years of the Plan.

Curiel's projected monthly net income was at odds with what she reported throughout her bankruptcy. At the time Hamilton Trust opposed confirmation on November 13, 2022, Curiel had submitted her MORs for February through September 2022. Those reports detailed monthly income

29

ranging from $10,555 to $18,306, resulting in average monthly income of $12,581. Curiel proposed to make monthly Plan payments that alone totaled $12,050. According to Hamilton Trust, the MORs established that Curiel's actual finances left a sizable shortfall to cover the remainder of her monthly obligations, estimated to exceed $5,000.

Curiel addressed this shortfall by stating that she was increasing her wages from Lucky 7 and was adding a significant monthly contribution from her non-debtor partner Hernandez. Curiel explained that she had been taking a minimal salary of $31,000 annually to help Lucky 7 get through the Covid pandemic. But beginning August 1, 2022, Lucky 7 would increase her wages to $4,500 per month to "offset rising inflation." Her MORs reflected that her monthly wages varied significantly and were often received in bunches; they ranged from $1,620 to $4,800. Curiel's MOR for August 2022 disclosed $3,230 in wages. Her September report showed only $1,620 in wages, but for the first time also included $3,300 for "company/officer income." No explanation for the company/officer income was provided. Given the closeness of the issue, it is significant that Curiel projected her **gross** monthly income would be used for her personal and Plan obligations. That is, she expected all of her monthly wages would be applied to her expenses without any reduction for taxes.

Curiel's Plan also depends heavily on her receiving $3,000 per month from Hernandez, who also works at Lucky 7. Voluntary plan contributions from friends and relatives of the debtor typically are viewed with

30

skepticism and are disfavored. *See, e.g., In re Gedda*, 2015 WL 1396605, at *4 (Bankr. M.D. Fla. Mar. 24, 2015) (chapter 11); *In re Deutsch*, 529 B.R. 308, 312–13 (Bankr. C.D. Cal. 2015) (chapter 13). Though Hernandez declared that he would, and could, make the monthly contributions to Curiel's Plan, he has not disclosed his gross or net monthly income, or otherwise substantiated his income. The MORs reflect that, beginning in April 2022, Hernandez did contribute to Curiel on a monthly basis. But his contributions between April and September 2022 ranged between $825 and $987.50. This is a far cry from the $3,000 per month contemplated by her Plan.

We agree with the bankruptcy court that if one were to accept Curiel's projected income and expenses, feasibility would be a very close question. We also understand that we must give due deference to the bankruptcy court's findings. *See Cardenas v. Shannon (In re Shannon)*, 553 B.R. 380, 387 (9th Cir. BAP 2016). But "sheer optimism and hopefulness, without more, is not sufficient to support a finding of feasibility." *In re Om Shivai, Inc.*, 447 B.R. 459, 463 (Bankr. D. S.C. 2011); s*ee also In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994) ("sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises" (cleaned up)). Curiel's MORs undermine her projections. They similarly undermine the bankruptcy court's inference based on the projections that Curiel's income was reasonably sufficient to support performance of her Plan. Her calculations suggest that if everything were to go as projected,

31

she initially would have just enough to perform her Plan obligations. However, her monthly reporting cannot be reconciled with the projections or the bankruptcy court's feasibility findings. More specifically, there is no reliable, concrete evidence to support that Lucky 7 will be able to fund the necessary income—that Curiel will be able to contribute $4,500 in gross monthly income from her wages and receive $3,000 from Hernandez. *See In re Aurora Memory Care, LLC,* 589 B.R. at 642 ("Optimistic but hollow declarations from a debtor's principal about hopes for funding do not do the job." (cleaned up)).

Additionally, Curiel's expenses are understated. She did not revise her projections to include Hamilton Trust's amended claim. Under the terms of her Plan, Curiel's monthly Plan payment should increase to $6,020 instead of the original monthly Plan payment of $5,779. This $241 increase in monthly payments ($6,020 - $5,779 = $241) alone would eliminate any positive monthly net income even under her projections over the first three years. Similarly, Curiel's MORs reflect that some of her personal expenses, specifically her rent, groceries, and payments to a bookkeeper, exceeded the budgeted amounts she projected as of the date of confirmation.[12]

---

[12] Curiel's MORs reflect that Curiel's rent increased from $1,200 to at least $1,300 per month beginning in August 2022. While Curiel included minor increases for other expenses over the term of her plan, her personal rent was never adjusted in the projections. Additionally, Curiel's MORs include an expense for a bookkeeper that ranged from $272 to $500 per month between February through September 2022, though there is no discussion whether such fees were ordinary expenses or related to the bankruptcy.

Adjusted to reflect the increase in monthly payment to Hamilton Trust and a $100 increase in her personal rent, Curiel has a negative monthly income ranging between $88 and $246 over the first three months of the Plan (without taking into account the taxes withheld from Curiel's wages).

In a different case these amounts might be dismissed as trivial. In this instance, however, they serve to confirm that Curiel's finances do not support feasibility on this record. Curiel appears to acknowledge the risk inherent in relying on Hernandez for $3,000 per month over the 60-month term of her Plan. She argued to the bankruptcy court that she would be able to meet her Plan obligations even without the $180,000 budgeted from Hernandez over its term. In her Plan, Curiel stated that even without his monthly contribution, "she would earn this as follows: the current $4,500/month which the business already pays her + $3,000 x 60 months is $180,000, and her corporation has $399,000 sitting in the bank." Again, the unexplained and significant reduction in Lucky 7's loan proceeds suggests otherwise.

On these facts, we are left with the definite and firm conviction that Curiel did not carry her burden to prove that the Plan had a reasonable probability of success. Curiel's own projections suggest a razor thin monthly net income to meet her monthly personal and Plan obligations. Her positive monthly net income is at risk to the smallest changes to her finances, as demonstrated by her increased payments for personal rent and to Hamilton Trust to account for its amended claim. Her projections are

simply not realistic given her historical income stated in her MORs. Yet, she has not reconciled her actual expenses such as her increased rent, Hamilton Trust's increased claim, or the taxes withheld from her wages. These concerns only heighten the need for evidence that Lucky 7's finances can bear the weight Curiel's Plan places on them. Yet, the record lacks any concrete or specific evidence demonstrating that Lucky 7 will be able to fund Curiel's and Hernandez's income at the required levels while paying its monthly rent. Though Curiel's explanation that Lucky 7's SBA loan was needed to address the effects of the pandemic is understandable, there is simply no evidence as to how Lucky 7 was able to rebound in 2022. Bluntly stated, it is unclear whether Curiel's actual and projected income is dependent on Lucky 7's diminishing loan balance. The only evidence of Lucky 7's finances show that it lost money in 2021 while paying Curiel only $36,000 in salary.

Given Curiel's dependence on Lucky 7's finances to fund her Plan obligations, and the discrepancy with her historical income demonstrated in her MORs, we conclude that the court's determination of feasibility under § 1129(a) is not supported by the record and was clearly erroneous.

### c.    Curiel's ability to make the balloon payments.

Hamilton Trust also argues that Curiel failed to prove a reasonable likelihood that she would be able to make the required balloon payments to her secured creditors at the end of her Plan. The court did not specifically address the prospects of Curiel's ability to make the required

34

balloon payments to her secured creditors. Rather, it appears to have been factored into its general analysis of feasibility under § 1129(a)(11).

Even under § 1129(a)(11), courts are required to determine whether a sufficient refinancing or sale is reasonably likely to occur where a debtor intends to fund future balloon payments in that manner. *See Pineda Grantor Tr. II v. Dunlap Oil Co. (In re Dunlap Oil Co.)*, 2014 WL 6883069, at *16 (9th Cir. BAP Dec. 5, 2014); *2010–1 CRE Venture, LLC v. VDG Chicken, LLC (In re VDG Chicken, LLC)*, 2011 WL 3299089, at *6 (9th Cir. BAP Apr. 11, 2011) (citing *F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.)*, 341 B.R. 298, 311, 313–14, 316–17 (10th Cir. BAP 2006)); *see also In re Bashas' Inc.*, 437 B.R. at 915–16 (listing cases). The debtor must establish this reasonable likelihood by presenting credible, concrete evidence demonstrating the debtor's prospects for selling or refinancing the property. *See In re VDG Chicken, LLC*, 2011 WL 3299089, at *6; *In re Bashas' Inc.*, 437 B.R. at 915–16.

Curiel explains that after her monthly plan payments, she believes that the value of the Properties will exceed the total remaining secured debt and support either refinancing or a sale of the Properties. She concludes that either scenario would pay the secured creditors in full. In support of her argument, Curiel projects that her Properties would, at least, retain their combined current value of $1,530,000. She calculated that her total secured debt would be $1,301,262.12 in January 2029**.** That calculation,

however, was based on several errors that are individually small but cumulatively significant.

First, Curiel originally calculated her future secured debt balance based on **six** years of Plan payments. At the court's request, Curiel agreed to reduce the term of the Plan payments to the secured creditors to five years with the balloon payments to be made by the 60th month. Curiel never adjusted her calculations for the shorter term which necessarily results in higher payoffs needed to satisfy her secured debt.

Second, as previously referenced, Hamilton Trust increased its original claim amount from $751,582 to $782,971 shortly before the confirmation hearing. The amended amount should result in an increased monthly payment but would also increase the amount of the balloon payment.

Finally, Curiel's calculations in her confirmation brief reflected that all of the adequate protection payments on the Daskalakis judgment liens would be applied to reduce the principal of the smaller judgment lien. Curiel offers no support for this purported principal deduction, or for ignoring the other judgment lien.[13] We, therefore, assume that the adequate

---

[13] We offer no opinion as to whether the adequate protection payments covered all interest on Daskalakis' secured claims. But even if these payments somehow were applied to the smaller judgment lien, Curiel has not presented evidence of the application to both interest and principal. Not all of the payments could properly be applied to principal. Moreover, it is unclear why the larger judgment would not accrue interest or receive adequate protection payments.

protection payments were applied to interest on Daskalakis' two judgment liens and the principal amounts remain the same.

Adjusting the term of Curiel's Plan to 60 months, the amounts owed to the secured creditors would be:

| Secured Creditor | Total Per Curiel | Balance at Month 72 Per Curiel | Balance at Month 60- Trust paid $5,779/mo | Balance at Month 60- Trust paid $6,020/mo |
|---|---|---|---|---|
| Orange County Tax Collector | $ 8,944 | $ - | $ - | $ - |
| Hamilton Trust (amended claim) | $ 782,971 | $ 729,634 | $ 765,630 | $ 747,661 |
| Daskalakis Abstract #1 | $ 157,500 | $ 130,929 | $ 150,397 | $ 150,397 |
| Daskalakis Abstract #2 | $ 464,100 | $ 432,485 | $ 443,170 | $ 443,170 |
| Orange County Transportation | $ 10,550 | $ 8,214 | $ 10,074 | $ 10,074 |
| **Total Secured Debts** | **$ 1,424,065** | **$ 1,301,262** | **$ 1,369,272** | **$ 1,351,303** |

Curiel asked the bankruptcy court to assume that the Properties would hold their value over a five-year period.[14] The parties have focused on the sale of the Properties to fund the balloon payments, and no evidence was presented to support the refinance of the Properties in five years. Even if we accept that the Properties will retain their present value through the

---

[14] Curiel submitted a declaration testifying that she expects one or both Properties to appreciate in value over the Plan term. The only basis she offers for this expectation is that both Properties are fully rented out. Her assumption assumes no deterioration over her five-year plan term. The Sycamore Property is used for monthly rentals and the N. East Property is used as a tire shop. The Plan initially provides for $100 per month for real property maintenance, repair and upkeep for each property and incrementally increases that amount to $300 per month by the end of the Plan term. There is no evidence as to what amount of maintenance, repair, or upkeep should reasonably be required, or the effect on the Properties' valuation. These limited amounts, with no evidence as to the required maintenance for each property, calls into question the reasonableness of Curiel's future valuation of the Properties.

next five years, a sale at $1,530,000 results in a thin amount of equity above the balance of secured debt. All parties have estimated the costs of sale at 8% of the value, and we do the same. Under any scenario a sale would result in less than a $60,000 margin for payment of all projected balloon payments:

| | Total Per Curiel | Balance at Month 72 Per Curiel | Balance at Month 60-Trust paid $5,779/mo | Balance at Month 60-Trust paid $6,020/mo |
|---|---|---|---|---|
| **Estimated Value of Properties** | $ 1,530,000 | $ 1,530,000 | $ 1,530,000 | $ 1,530,000 |
| Less Costs of Sale at 8% | $ (122,400) | $ (122,400) | $ (122,400) | $ (122,400) |
| **Sale Proceeds Net of Closing** | $ 1,407,600 | $ 1,407,600 | $ 1,407,600 | $ 1,407,600 |
| **Total Secured Debt Remaining** | $ (1,424,065) | $(1,301,262) | $(1,369,272) | $(1,351,303) |
| **Estimated Equity** | $ (16,465) | $ 106,338 | $ 38,328 | $ 56,297 |

Curiel's declaration demonstrates our overarching concern regarding the valuation issue: she failed to lay any foundation regarding her expertise to opine on the **future value** of the Properties. A debtor may offer her lay opinion on the current value of the real property she owns. *See In re Cocreham*, 2013 WL 4510694, at *3 (Bankr. E.D. Cal. Aug. 23, 2013) (citing Fed. R. Evid. 701). Here, Curiel relied upon appraisals to establish the current value of the Properties. An opinion of future valuation, however, requires expertise in the types of information that might be relevant to an appraiser in establishing the value of the property. *Id.* (citing Barry Russell, *Bankruptcy Evidence Manual*, Vol. II, § 701.2, p. 784–85 (2012–13)). Curiel's bald declaration of future value failed to establish her expertise to value the Properties in five years. Rather, she has only provided her belief that the

Properties will retain their current value or appreciate. Because the record fails to establish her qualifications to render such an opinion, or the basis for such an opinion, Curiel failed to prove even a reasonable likelihood that she would be able to refinance or sell the Properties in satisfaction of her secured debt.[15]

For these reasons, we REVERSE the bankruptcy court's Plan confirmation order and REMAND the case for further proceedings. We do so largely because the record does not contain sufficient evidence to carry the debtor's burden even under the general feasibility standard of § 1129(a)(11). On remand, the parties and the court are free to address feasibility in further detail consistent with the applicable legal standards.

We are sensitive to, and acknowledge, the reality that cases under subchapter V differ in timing and temperament from other chapter 11 cases. Still, Curiel could offer more evidence about the financial performance of her business in the present and recent past, to provide concrete evidence that Lucky 7 can afford to increase her salary independent of its remaining loan proceeds. As we have pointed out, the evidence she offered to date is sparse at best, and inconsistent with her own predictions at worst. Because her partner's contributions are a key element of the Plan, additional evidence should also be provided about her partner's ability to make the contributions that he has promised. Curiel

---

[15] Given our decision, we need not review Hamilton Trust's other evidentiary objections, so we decline to address them.

could also offer expert testimony about the prospects of her business and the likelihood of a refinancing or sale under the Plan, though we acknowledge that this only works if Curiel can afford to hire an expert.

These questions and concerns are left for the parties and the bankruptcy court to consider on remand as it sees fit.

**B.      Appeal from denial of relief from stay motion.**

Hamilton Trust also challenges the denial of relief from stay because Curiel conceded at confirmation that she lacked equity in her Properties. It relies on § 362(d)(2), which permits the bankruptcy court to grant relief from stay with respect to property when there is no equity in such property and that property is not necessary to an effective reorganization. *See Sun Valley Ranches, Inc. v. Equitable Life Assurance Soc'y of the U.S. (In re Sun Valley Ranches, Inc.)*, 823 F.2d 1373, 1376 (9th Cir. 1987). Hamilton Trust only addresses the equity prong of § 362(d)(2) and does not address Curiel's need of the Properties for her reorganization. Indeed, the totality of its argument on appeal is comprised of two sentences.

The bankruptcy court trailed the relief from stay motion and took the Plan confirmation hearing first. After confirming the Plan, which obviously depends upon retention and use of the Properties, the court denied the relief from stay motion without explanation.

We are remanding the case for further proceedings on confirmation. It is far from certain on this record that Curiel cannot propose a confirmable plan on remand. Any such plan is likely to depend upon the

retention and use of the Properties. Accordingly, we VACATE and REMAND the denial of the relief from stay motion. On remand, the bankruptcy court may consider whether, in light of the reversal of the Plan confirmation order, there is any basis for concluding that the Properties are necessary to an effective reorganization.

## CONCLUSION

For the reasons set forth above, we REVERSE and REMAND the Plan confirmation order for further proceedings. We also VACATE and REMAND the denial of the relief from stay motion for further consideration in light of the reversal of the Plan confirmation order.